BROWN, J., dissenting.
On motion his Honor continued the restraining order and enjoined the defendants from putting the agreement hereinafter stated into effect, or taking any action thereunder. It was admitted that the First National Bank of Tarboro was duly organized under the National banking act, and was conducting a general banking business as authorized by law; that plaintiff is a stockholder in the bank; that the defendant Holderness is president, Johnson vice president and Pennington cashier of the bank; that the bank was organized in the fall of 1906, and the above named have been its officers since its organization; that the stock in the bank is held by many persons, distributed among the business men of Tarboro; that its business has been well managed and the bank (294) has been prosperous; that on 2 March, 1909, certain Stockholders of the bank, among them the defendants, anticipating that one Henry Clark Bridgers was attempting to acquire the control of the stock in the bank, entered into the following agreement:
Memorandum of an agreement made this 2 March, 1909, between certain stockholders of the First National Bank of Tarboro, hereinafter specifically named and designated, and George A. Holderness, C. A. Johnson and Ed. Pennington, trustees and attorneys with power: *Page 283 
"Whereas the First National Bank of Tarboro, a National bank organized under the banking laws of the United States of America, is engaged in conducting and carrying on the business of a National bank at Tarboro, N.C. ; and
"Whereas the management, direction and control of said institution has at all times to this date been satisfactory to the undersigned and in conformity with the laws of the United States and State of North Carolina; and
"Whereas, we, the following, represent and own the number of shares in bank, certificate number or numbers, which are set opposite our names, viz. (reciting names, certificate numbers, and numbers of shares of the subscribers, amounting to 269 shares out of a total of 500);
"Whereas we and each of us desire to have for a period of fifteen (15) years from and after the date of this instrument the continuance of the conditions above set out, and to assure ourselves and each other that these conditions and this regime will not be disturbed or affected by the act of any one of us, except as hereinafter provided for; and
"Whereas, in order to effect our purpose here and guarantee each to the other good faith in the performance of the conditions and agreement hereof, we and each of us have agreed to transfer our respective shares of stock to George A. Holderness, C. A. Johnson and Ed. Pennington, trustees named above, for the purposes and with the objects and intents herein declared:
"Now, therefore, this agreement witnesseth: That we (reciting names, certificate numbers and numbers of shares held by each subscriber) dohereby sell, set over, assign and pledge our respective shares of stock as named and described above to the said George A. Holderness, C. A. Johnson and Ed. Pennington, and their successors, on this special trust and for the uses following, to wit:
"First. The said trustees herein named are hereby given and clothed with the full power and authority during and for the term of fifteen (15) years next succeeding, upon the execution and delivery of this agreement, to vote said shares and certificates of stock at all stockholders' meetings, and for that purpose and to that end we (295) and each of us do hereby appoint, name and designate the said George A. Holderness, C. A. Johnson and Ed. Pennington, and their successors, our true and lawful attorneys, for us and in our names during said period, to vote said stock and fully represent us in all meetings, whether regular or called, of the stockholders, giving and granting unto our said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done *Page 284 
in and about the premises, as fully to all intents and purposes as we might or could do if personally present.
"Second. In the event that any of the stockholders hereto signing shall desire to pledge his stock as collateral for a loan or to sell and assign the same absolutely, then and in that event we do hereby bind ourselves and agree to give and do hereby give to said trustees above named and appointed, and to their successors, the right, option and privilege, ifthey shall so elect and desire, to sell for us and in our names and to transfer upon the books of the company the certificate or certificates of stock held by us, to such purchaser or purchasers as they or their successors shall furnish or procure: Provided, always, that the price by said trustees to be had and obtained for said certificate of stock shall be the book value of the same at the time said sale, pledge or transfer is attempted to be made, said trustees agreeing to take same at book value. For that purpose and to that end we do further appoint said trustees and their successors for a like period of fifteen (15) years our lawful attorneys, for us and in our names, to sell, transfer upon the books and deliver our said stock, receive for our use and benefit the price thereof, and to do all other acts and things in the premises that may be necessary to fully and legally effectuate and carry out the purpose hereof.
"Third. Contemporaneously with the signing, sealing and delivery of these presents the several shares of stock subscribed above and hereby transferred are to be assigned and transferred in blank, according to form on the back of each certificate or certificates, and delivered into the custody of said trustees, who, at the time that the said stock is delivered to them, shall execute and deliver to the persons transferring and surrendering the same, receipts showing the serial number, certificate and number of shares so transferred and delivered to them by each person.
"Fourth. If a vacancy shall occur during the term of fifteen (15) years herein fixed in the board or number of trustees herein named, either by death, resignation or the removal from the State of (296) either one of the three named, then the trustee or trustees remaining shall have and they are hereby clothed with full power and authority to fill the vacancy or vacancies so caused, by appointing in the stead and place of the trustees or trustee so dying, resigning or removing the other trustees or trustee to succeed to the rights, powers, trusts and responsibilities herein given, imposed and declared in favor of the said Holderness, Johnson and Pennington, and such successor or successors are hereby given like power with the original trustees herein named, and will hold the shares of stock hereby transferred in like plight and condition as do the three original trustees herein named. *Page 285 
"Fifth. That this agreement shall be binding and obligatory upon each and every of the subscribers hereto, and the said stock hereby undertaken to be transferred and delivered to the trustees shall remain in their custody and possession under the conditions and for the purpose herein declared for a period of fifteen (15) years from and after the date of this instrument: Provided, nevertheless, that the said agreement may be earlier rescinded and made nugatory by the unamious [unanimous] vote and agreement of the several signers thereof.
"In witness whereof, the above-named stockholders have hereunto set their hands and affixed their several seals, this the day and year written above." (Signed under seal.)
"We do hereby accept the certificates of stock transferred to us, upon the trusts, terms and provisions set forth in the above paper-writing.
 "GEO. A. HOLDERNESS, "C. A. JOHNSON, "ED. PENNINGTON, "Trustees and Attorneys in Fact."
It is further admitted that the trustees executed to each of the subscribers to said agreement a receipt or certificate in the following words:
"Received of _______________ Certificate No. _____ for ______ shares of stock in the First National Bank of Tarboro, the same being assigned, transferred and delivered to us and held by us, under the according to the terms and provisions of an agreement made the second day of March, 1909, between certain of the stockholders of said bank and the undersigned. This the _____ of March, 1909."
The plaintiff alleged that the "said agreement is in violation of his rights and the rights of the other stockholders, and is in law void and of no effect, in that it seeks, in advance of the meeting of the stockholders, to fix the control of the stock of the bank, so that no argument, reason or persuasion on the part of the minority stockholders can or shall have any effect in any of the meetings of said (297) stockholders," etc.
The defendants allege the following as the intent, purpose and justification of said agreement: "4. That the only object and purpose of the said paper-writing were, first, as long as the stock represented in and by said paper-writing remained the property of him who signed the agreement, to hold together enough of the stock to protect the bank and the stockholders thereof against injurious, menacing and sinister designs of the said H. C. Bridgers, and to assure the continued prosperity, welfare and success of the institution; and, second, that whenever any owner of any share of said stock should desire to pledge the same as collateral for *Page 286 
a loan, or to sell and assign the same absolutely, then to give to the trustees and attorneys named and appointed, and to their successors, the right, option and privilege to sell for said stockholder and in his name to transfer upon the books of the bank, the certificate or certificates of stock held by him to such purchaser or purchasers as said trustees and attorneys, or their successors, should furnish and procure, with the express provision, always, that the price by said trustees to be had and obtained for said certificates of stock should be the book value of the trustees agreeing to take the stock at its book value.
"In respect of its first primary object of the agreement, these defendants say that each and every one who signed the said agreement, at the time of signing the same, were fully informed and knew, and these defendants knew, that the effect of the said agreement, so far as it attempted to clothe the trustees named with the power to vote the stock at corporate meetings, was but a simple voting pool, the legal effect of which was to empower said trustees to vote the shares of stock deposited with them at all meetings of the stockholders of the said bank, only when the beneficial owner thereof should fail to attend and demand the right to vote the same in person, it being perfectly understood at the time that the trustees named in said paper, at any meeting at which any subscriber to said paper should be present, if the stock of such subscriber were not voted personally, it should be voted by the trustees as said stockholder desired and directed, and that only in the event of the failure of said stockholder to attend a meeting and vote in person, or to attend the meeting and direct the trustees how to vote, should the trustee vote said stock according to their judgment and opinion. And these defendants solemly aver that all of the parties to said agreement were so informed (298) and so understood the same, before subscribing their names thereto, and subscribed the same expressly upon such agreement.
"In respect to the second object sought to be accomplished, to wit, that of giving a primary right of option to said trustees, these defendants say recognizing the fact that so long as the owner of a share of stock remained its owner, he had the legal right to vote it in person, if he so elected; but anticipating that a contingency might arise which would compel some such owner to part with the stock, either by sale or by hypothecation, the said stockholders signing the said contract solemnly agreed one with another, that because the life and success of the bank and the interest of the small stockholders therein were imperiled by the persistent attempt on the part of the said H. C. Bridgers to acquire control, in the event any one of them found it necessary to sell his or her holding, gave to the trustees named, acting for their associates, a first right of purchase of said stock. In order to safeguard the rights and interests of him or her who might be impelled by necessity to part with said stock, *Page 287 
it was, on the other hand, pledged by the trustees, acting for their associates, that such stockholder should receive for his or her stock not only its market value, but its book value, which these defendants allege is, under normal conditions, always a few points in advance of the market value."
The defendants appealed from the order of the judge making the injunction perpetual against the defendants.
The defendants' counsel frankly concede that the judge below was correct in his ruling, unless we now modify the doctrine announced by this Court inHarvey v. Imp. Co., 118 N.C. 693; Bridgers v. Staton, 150 N.C. 216;Sheppard v. Power Co., 150 N.C. 776. We have, therefore, reexamined the question presented with great care, and have reached the conclusion that the principles controlling the decision of those cases above cited are wise, salutary and make for the better management of corporate bodies.
The "voting trust" agreement presented in the present case is in contravention of a wise public policy, opposed, in our opinion, to a proper construction of the Federal statutes governing the management of National banks, and is invalid.
In the absence of a decision of the Supreme Court of the United States which would be controlling upon us, we are constrained to (299) determine the validity of the agreement by the principles heretofore declared by this Court and which we find to be in accord with the well-considered opinions of other courts, and with a proper construction of the Federal statutes.
This agreement confers upon the trustees and their successors the uncontrolled power of management of the bank for fifteen years; the unrestricted power of filling vacancies in their number; it accomplishes the complete separation of the legal and equitable ownership of the stock; it confers an irrevocable grant of representation by proxy for the term; its sole consideration is the mutual promises of the subscribers; it is uncoupled with any interest; and by it, the subscribing stockholders, owning a majority of the stock of the bank, strip themselves of their power to vote and to participate in the annual meetings of the stockholders, at which directors are elected, and to formulated and determine the policy of the bank. Those who are attempted to be entrusted with these large powers are the president, vice president, and cashier — persons forbidden by section 4155, Rev. Stat. U.S., to act as proxies, and the *Page 288 
avowed purpose, to quote the words of the agreement, is that "we and each of us desire to have, for a period of fifteen years from and after the date of this instrument, the continuance of the conditions above set out, and to assure ourselves and each other that these conditions and this regime will not be disturbed or affected by the act of any of us, except as hereinafter provided" (to wit, unanimous consent). The surrender of their duties by the stockholders to their proxies is complete. No limitation is placed upon the trustees named in selecting other trustees to fill any vacancy that may occur, no stipulation that the subscribers to the agreement shall be consulted, no power reserved in them to be used except by unanimous consent. "The power is absolute in the trustees to do as they see fit, and any instructions from the majority of stockholders would be useless."
In Warren v. Pim, 66 N.J. Eq., 353, Judge Pitney, in a well-reasoned and elaborate opinion, considers these voting-trust agreements in every point of view. At p. 378 he says: "I base my view that an irrevocable voting trust, or any other irrevocable grant (uncoupled with an interest) assuming to confer upon the donee the power to vote at corporate elections for the choice of directors, is unlawful and void: first, upon the plain letter of our general corporation act (P. L. of 1896, p. 277), and, secondly, upon the reason, spirit and manifest policy of the act."
The provisions of the New Jersey statute, cited by the learned (300) judge as controlling, are the same as those of our statute, to wit, that the directors are to be chosen annually by the stockholders, and that each stockholder shall be entitled to one vote, in person or by proxy, for each share of stock held by him, but no proxy shall be voted on after three years from its date. Rev., sec. 1184.
The learned judge proceeds further: "When it says an absent stockholder may vote by proxy, it means that no substitute for an absent stockholder, other than his proxy, may be admitted to vote in his stead. A proxy, ex vitermini, is revocable unless coupled with an interest. A proxy is presumably voicing the judgment and will of his principal. An irrevocable assignment of the voting power or, what amounts to the same thing, an act that irrevocably delegates the voting power to one who has no interest in the stock, upon trust that he will vote according to his own judgment, discretion and will, is an attempt to constitute a substitute voter who is not actuated by any interest in the welfare of the company. The difference is fundamental." Again, he says: "There may be room for dispute as to how unimportant may be the duties of a bona fide trustee with respect to the other property, in order that the right to vote in the management of the property may be annexed to the trust; but there is, in my mind, no doubt that the right to vote cannot be annexed to a trust which holds only the power of voting. An appurtenant *Page 289 
right cannot be appurtenant to itself alone; an incidental power cannot be incidental to itself alone. Such a status is to me as unthinkable as a human voice without a human being, as a lever without a fulcrum; and, of course, to say that the assignment of the mere voting power `in trust' passes to the trustee, by implication, such interest in the stock as will support the voting power, is the same as to say that the power may be appurtenant to itself alone." In accord with these views is the opinion of the Supreme Court of Georgia in Morell v. Hoge, 130 Ga. 625; 16 L.R.A. (N.S.), 1136.
The National banking act contains similar provisions. Indeed, in prescribing the qualifications of directors this act goes even further than our own statutes. Sections 5146 and 5147, Rev. Stat. U.S., prescribe that a director must be the owner in good faith of at least ten shares of stock, and the same shall not be in any way pledged or hypothecated, and that three-fourths of the directors must have resided at least ten shares of stock, and the same shall not be in any way pledged or hypothecated, and that three-fourths of the directors must have resided at least one year in the State wherein the bank is located, and must be residents therein during their continuance in office. The evident purpose of this enactment is stated in Bank v. Hawkins, 174 U.S. 364. (301)
The views of this Court, as expressed in the three cases cited above, are supported by the Shepaug Voting Trust Cases, 60 Conn. 553.
In Foll's Appeal, 91 Pa. St., 434, the Court said: "A National bank is aquasi- public institution. While it is the property of its stockholders, and its profits inure to their benefit, it was nevertheless intended by the law creating it that it should be for the public accommodation. It furnishes a place, supposed to be safe, in which the general public may deposit their moneys and where they can obtain temporary loans upon giving the proper security, in the exercise of its equitable power." So the Court refused, "for reasons of public policy, to decree specific performance of a contract to sell certain shares of stock of a bank where such shares were sought for to control the bank, and were being purchased by borrowed money." We can see, therefore, less justification for these voting-trust agreements where the purpose is to obtain the control of the majority of the stock by a banking institution.
It is urged upon us that this voting-trust agreement ought to be sustained, because it was intended to prevent the control of a majority of the stock of the bank from passing into the hands of a stockholder who, to many of the stockholders, seems to be persona non grata, and who is buying up the stock and paying for it much more than its market or even book value. It is clear that the control of the stock cannot be acquired by this person unless some of the subscribers to the present agreement are willing to sell their stock to him; some, it seems, have done so; and this agreement prevents the transfer of the absolute and unconditional title. We are, by this argument, asked to sustain this agreement to prevent *Page 290 
a man who has invested a large sum of money in the purchase of this stock, who has that direct interest in the success of the bank which an investment of his own money necessarily creates, and who shall be denied the full use of his property by being deprived of an incident or privilege inseparably connected with it; and this to be done in favor of three trustees whose only interest in the stock of the other subscribers is to vote it at the annual or special meetings of the stockholders — to perform a trust uncoupled with an interest. While it may be in exceptional cases, that some good may be accomplished by such agreements, yet, in our opinion, the general effect is vicious and in contravention of a sound public policy.
It cannot be, nor is it intended to be, denied that those (302) stockholders, be they few or many, owning the majority of the stock of a corporation, can agree, after full consideration, to maintain a certain business policy of the corporation or a certain management, and in giving the right of voting by proxy, our statute recognizes this; to accomplish this, they can give proxies that can last for three years; but these proxies are revocable at the will of the principal, and they cannot be made irrevocable, and the sale of the stock is itself a revocation of the proxy.
While the agreement presented, certainly, in the largest measure, expresses the confidence of the subscribers in the judgment, capacity and integrity of the three trustees named, we are constrained to hold the agreement contrary to public policy and void. There was no error in the order appealed from, and the judgment is
Affirmed.