No. 10,174.

PEOPLE, EX REL. ARKANSAS VALLEY SUGAR BEET AND IRRIGATED LAND CO. *v.* BURKE, ET AL.

Decided January 8, 1923.

Ouster proceedings against the directors of a corporation. Judgment of dismissal.

*Affirmed.*

1. CORPORATIONS—*Directors—Election.* Section 865, R. S. 1908, providing that each stockholder of a corporation *shall* have the right to nominate and vote for directors to be elected, and that directors shall not be elected in any other way than that pro-

vided, is mandatory and imperative, and any contract or court decree providing for the nomination and election of directors radically different from, or contrary to the only method which the statute prescribes, is contrary to public policy and void.

2.     *Voting Trust Agreements—Validity.* The question of whether every separation of voting power from beneficial stock ownership, all irrevocable powers of attorney for voting of the stock, or all voting trust agreements, are valid or not, discussed, but not determined.

3.     JURISDICTION—*Judgments—Collateral Attack.* Jurisdiction in its fullest sense is not restricted to the subject matter and the parties. If the court lacks jurisdiction to render, or exceeds its jurisdiction in rendering a particular judgment in a particular case, such judgment is subject to collateral attack, although the court had jurisdiction of the parties and of the subject matter.

Although a court has jurisdiction of the parties and subject matter, it is still limited in its modes of procedure and in the extent and character of its judgments.

4.     CONTRACTS—*Public Policy—Void Judgments—Collateral Attack.* If a contract is void on its face as contrary to public policy, a decree of a court which assumes to enforce it, is void as beyond its jurisdiction to render, and may be collaterally attacked and impeached in another proceeding.

*Error to the District Court of Bent County, Hon. A. C. McChesney, Judge.*

Mr. JAMES GRAFTON ROGERS, Mr. CHARLES R. ENOS, for plaintiff in error.

Mr. H. L. LUBERS, Mr. GRANBY HILLYER, for defendants in error.

*En banc.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

THE Arkansas Valley Sugar Beet and Irrigated Land Company and the Fort Lyon Canal Company, the former in this opinion styled the Storage Company, the latter the Canal Company, are domestic corporations organized to acquire, and each of them has acquired, and now is, and

for many years has been, the owner and operator of an extensive and valuable irrigating system in the valley of the Arkansas River in southeastern Colorado. Neither corporation is the builder or original owner of its present system, having obtained the same by purchase or under a reorganization of a former corporation owner. Some of the contracts, and some of the transactions involved in this litigation, were between their grantors, to some other contracts and transactions they, themselves, were the immediate parties. To avoid prolixity and confusion, and because these two corporations now own the property rights, and have assumed the obligations of their respective grantors, they will be regarded as the immediate actors, and treated as if they actually participated in all these matters and controversies.

In the year 1896 the Canal Company was in the custody of the district court of Prowers county, through its receiver. Its stockholders, under the terms of a contract with the original builder of its canal, were about to become its legal, as well as equitable, owners, and the canal was to be conveyed to a new canal company. The Storage Company, desiring to build an irrigating and storage system of its own, entered into a contract with the stockholders of the old canal company, represented by the receiver, whereby, among other things, the Storage Company and the new canal company, thereafter to be incorporated, were to own, or, at least, were to use jointly a part of the existing physical canal, in consideration of which the Storage Company was required to, and it did, at considerable expense, rebuild and enlarge the same. To the old canal company stockholders the stock of the new canal company was to be, and was, issued, and for the purpose of giving some kind of representation to the Storage Company in the problems of maintenance and operation of the canal, or that part of it subject to joint use, the same contract by which this joint interest was created, further specifically provided that the stockholders of the new canal company, at their regular annual election of di-

rectors, shall annually vote for and elect as two of its five directors, the two stockholders of their own number to be selected and designated by the Storage Company. This provision, in effect, amounted to an irrevocable agreement by the stockholders of the Canal Company to vote according to the direction of the Storage Company for two of its five directors, not according to their own wish or pleasure, or as guided by their own judgment and discretion, but as determined for them by the board of directors of a rival and competitive corporation, whose property rights and interests, not only might be, but in important respects, were antagonistic and adverse to the rights and interests of their own corporation. To secure its permanency, this provision was incorporated or referred to in the articles of incorporation of the new canal company, and appears also in some other contracts between the corporations and stockholders.

As a further effort to "cement" and fortify this election feature, the same was subsequently brought before the district court of Prowers county, and an order or decree was made which apparently sanctioned and approved of the making of this contract, by the receiver, which seems also to have been approved by some of the old stockholders. The approving decree was not rendered during the year 1896, but we designate it here as the decree of 1896. In *La Junta & Lamar C. Co. v. Hess,* 31 Colo. 1, 71 Pac. 415, this contract, so made and judicially approved, was before our own Court, and apparently there approved, insofar as it concerns the right to the use of the main canal and an uncompleted reservoir for the purpose of conducting and conserving water for storage. There was no reference in the opinion to, and no indication of approval of, the provision concerning the election of directors, and the court says in its opinion that the plaintiffs in error, who questioned the action of the district court in authorizing the receiver to enter into the contract, were not in a position to do so. However that may be, in our view, except as a part of the history of these unfortunate controversies,

the 1896 contract and decree are neither important nor controlling, because the Storage Company now bases its right to the relief asked upon a later decree of 1918, which modified, or took the place of, the contract and decree of 1896. Besides, our conclusion as to the effect of the decree of 1918, equally applies to the 1896 decree.

From this somewhat incomplete statement it would seem that these two systems were so interlaced in their operation that, as the Storage Company contends, if the parties in interest can agree, or if they have entered into an enforceable agreement, the joint operation might be continued to the advantage of both systems. It is scarcely necessary to say, however, that it is not our province to advise these parties what plan of operation and management to adopt. Our duty is to decide the legal questions submitted for determination. It was not long after this agreement was made and the approving decree entered, that internal disputes arose between different factions of the Canal Company and the Storage Company, and some of the stockholders of the Canal Company repudiated this agreement and decree of 1896. For several years attempts were made to compromise their differences, and amicably continue the joint control. Finally, in the year 1912, after a long series of fruitless conferences, the Storage Company began a suit in the district court to assert and enforce its right under the decree of 1896. To this suit the Canal Company, and all of its stockholders were made defendants. The court was called upon to adjust and settle all the differences between the two irrigating systems and their stockholders in whatever method seemed appropriate. Not all of the individual stockholders were served with summons, but a number of them appeared and some of them filed a motion to dismiss for lack of jurisdiction. For more than six years the action was allowed to rest. The motion was not passed upon until December 5, 1918, when it was overruled, and on the same day the court rendered a decree pursuant to a joint recommendation of the attorneys representing both the

Storage Company and the Canal Company, and as a result of a new agreement, and as no one appeared in opposition, the decree passed as a matter of course. This decree of 1918 is not essentially different from the first contract and the approving decree of 1896; the only substantial difference being that section 1 of the later decree provides that the Storage Company "shall hereafter be entitled to designate one director of the defendant, the Fort Lyon Canal Company, instead of two, as contemplated by the previous agreements and orders of the court made on that subject." The language of the new decree, in paragraph 2 thereof, which is important here, reads:

"2. That in electing the director to be designated by The Arkansas Valley Sugar Beet and Irrigated Land Company, that Company at each meeting of The Fort Lyon Canal Company stockholders at which directors are to be elected, shall nominate two stockholders of The Fort Lyon Canal Company, one of whom shall be elected by the stockholders of The Fort Lyon Canal Company as the director to be designated by The Arkansas Valley Sugar Beet and Irrigated Land Company. Upon these two nominees a vote shall be taken by the stockholders, and in taking this vote The Arkansas Valley Sugar Beet and Irrigated Land Company shall vote the stock which it may then hold in The Fort Lyon Canal Company by casting its vote for one of its said nominees. The one of said two nominees who receives the higher number of votes shall be declared by the Chairman of the meeting to be elected as the director designated by the said The Arkansas Valley Sugar Beet and Irrigated Land Company. After such election of said director, The Arkansas Valley Sugar Beet and Irrigated Land Company thus having made its nomination, nominations for the remaining four directors to be elected shall be made in the ordinary manner and from these nominees the remaining four directors shall be elected in the ordinary manner, all stockholders having a right to vote."

For convenience there is here inserted, from section

865, Revised Statutes of 1908, the statutory way of electing directors of a private corporation.

"The corporate powers shall be exercised by a board of directors or trustees of not less than three, or more than thirteen, who shall respectively be stockholders in said company, and who shall (except the first year) be annually elected by the stockholders, at such time and place as shall be directed by the by-laws of the company; * * *. Elections of directors or trustees shall be made by such of the stockholders as shall attend for that purpose, either in person or by proxy; Provided, A majority of the stock issued shall be represented; * * *.

When it is found that a majority of the stock is represented at such meeting or adjourned meeting, the stockholders shall proceed to nominate the number of directors, trustees or managers to be elected, each stockholder having the right to nominate. The election shall be by ballot, on which each person voting shall write the names of as many persons as are to be elected from the nominees. Each stockholder shall have the right to vote in person or by proxy for the number of shares owned by him or her, and in balloting for directors he or she may vote said number of shares for as many directors, trustees or managers as are to be elected, or he or she may cumulate such shares and give one candidate as many votes as the number of directors multiplied by the number of his or her shares of stock shall equal, or to distribute them on the same principle among as many candidates as he or she may desire; and the persons having the highest number of votes in consecutive order shall be declared elected the board of directors, trustees or managers for that year, and such directors, trustees or managers shall not be elected in any other way."

At the annual election of the stockholders of the Canal Company for the years 1918 and 1919, the election was had in accordance with this provision of the decree, and not as the statute provides. In 1920 controversies again arose and the majority of the stockholders of the Canal Com-

pany, at their annual election for directors, refused to abide by this provision of the decree and proceeded to elect directors in accordance with the statutory method. The Storage Company thereupon brought these two actions: one, an ouster proceeding against the five directors of the Canal Company elected at the meeting in 1920, and the other a proceeding in contempt, entitled as in the case in which the 1918 decree was rendered, against three of the stockholders of the company, H. L. Lubers, Frank Kreybill and C. W. Burke, because of their refusal to cast votes for directors as required by that decree. Upon final hearing the trial court, deeming the decree absolutely void, dismissed the contempt proceeding against the respondents, and sustained a general demurrer to the ouster complaint and dismissed the action. The vital point at issue in both cases is the validity of the decree of 1918. The cases, tried separately below, were brought to this Court by separate writs of error, but were argued orally here as one case.

The question for decision, being the force and effect of the 1918 decree, may be thus subdivided: 1. Is the decree valid? 2. If invalid, is it void on its face, or merely voidable, and may it be questioned by the defendants or respondents in these actions, or in either of them?

1. With the fairness or unfairness, the wisdom or folly, of these contracts and decrees, we are not concerned. If the parties might lawfully make the contract, and the court had the power to render the decree, they should not be disturbed. While the officers and some of the stockholders of the two corporations, after much controversy and many negotiations, compromised their differences by entering into these contracts, they are not now in accord; the owners of the storage system being determined to enforce, the owners of the canal system equally determined to annul, the later decree, into which the former decree is merged. Much has been said by learned counsel, and more might possibly be said, in support of their respective con-

tentions as to the propriety and fairness of the contracts. The parties also join issue as to many other minor matters, such as the question, whether the majority of the stockholders of the Canal Company were parties to, or participated in, the many negotiations leading up to these contracts and decrees; whether stockholders not actually served with process, and even such as were served and appeared, but who did not give their assent, are bound by the later decree, if the same is valid. Various other interesting questions are raised and discussed, all of a minor character; but, in view of our conclusion that the decree of 1918, on which the entire case of the plaintiff Storage Company depends, is an absolute nullity, and may be questioned here by the defendants and respondents, these subordinate matters, though noted, will not be discussed or determined, since our conclusion requires the affirmance of the judgment irrespective of our views upon them.

The Storage Company, which, by these two proceedings, seeks to enforce the provision of the 1918 decree, asserts, and the Canal Company denies, its validity. As already stated, this decree requires the stockholders of the Canal Company, in nominating and electing its directors, to observe the method provided by the decree and *per force* to disregard the method fixed by the statute. We first observe that this statute is mandatory. The requirements that each stockholder shall, (not may), have the right to nominate and vote for each director to be elected, that directors shall not be elected in any other way than that provided, are imperative. The entire section plainly shows that the law-making power is declaring the public policy of the state in the important matter of choosing corporation directors. The courts have no more right than have individual stockholders to ignore or set aside this public policy.

If the naked legal question for decision was as to the validity of the 1918 contract, notwithstanding the able and plausible argument of the Storage Company, our task

would be an easy one. This record, however, requires us not only to pass upon the question suggested, but also whether validity was imparted to such a contract by the 1918 decree.

The sentence: "And such directors, trustees or managers shall not be elected in any other way" does not appear in the original statute, (G. L. 1877, Sec. 196), but first occurs in the amendment of 1895, (S. L. 1895, Chap. 66). From this, counsel for the Storage Company argues that the sentence has no bearing on the general law of irrevocable proxy, voting trusts, or other like problems, but is aimed solely at establishing cumulative voting. We do not think so. The language is plain and unambiguous. It is not susceptible of construction. It interprets itself. It is an absolute, unequivocal command that the directors shall not be elected in any other way than the way or ways which the section itself specifically provides. The sentence was not intended to establish cumulative voting. That object had been accomplished by previous provisions of the section. The inhibition is no more applicable or appropriate to cumulative voting than to voting by a stockholder of all his shares for as many directors as are to be elected. That is, two methods of voting—cumulative and non-cumulative—are provided, and the nominating and electing by either method is the same.

The next inquiry naturally is: Does the decree purport to provide a way of voting for directors other than that established by the statute? Indeed, that was virtually conceded by the Storage Company by the institution of these two actions. Their only purpose is to compel stockholders of the Canal Company, in electing directors, to observe the way commanded by the decree, and to disregard the way provided by the statute. If the two ways are not different, no such suit would have been brought. Our law-making body clearly manifested its intention to vest in the board of directors of a corporation all corporate powers, and to confer upon the stockholders the exclusive power to elect, either in person or by proxy, the

members of its governing board. This statute first provides that the stockholders, and each of them, shall nominate the number of directors to be elected. He may vote on his ballot for the names of as many persons as are to be elected from the nominees. Each stockholder has the right and power to vote for the number of shares he owns, and may vote said number of shares for as many directors as are to be elected, or may cumulate such shares and give one candidate as many votes as the number of directors multiplied by the number of his shares of stock shall equal, or he may distribute them on the same principle among as many candidates as he may desire. The persons having the highest number of votes in consecutive order, shall be declared elected, and they "shall not be elected in any other way."

Now, what does this decree say about the election of directors? It purports to give to the Storage Company, a rival corporation system, which may or may not be a stockholder, who has no property interest in the stock of any other stockholder, not giving to any other stockholder any consideration therefor, not for a reasonable period of time, but forever, at all corporate meetings for electing directors, the absolute and unlimited right and power to nominate two stockholders of the Canal Company, one of whom shall be elected by the stockholders of the Canal Company as the director to be designated by the Storage Company. Upon these two nominees a vote shall be taken by the stockholders, and the Storage Company shall vote stock of the Canal Company which it owns, for one of its own nominees. The one of the two so designated, who receives the highest number of votes, shall be declared as the director designated by the Storage Company. When the Storage Company has thus made its nominations, nominations for the four other directors to be elected shall be made in the ordinary manner, and from these nominees the remaining four directors shall be elected in the ordinary manner, all stockholders having a right to vote. The decree does not define what the ordinary manner is, but

presumably it is the statutory manner. This summary of the decree proves that its way, or manner, of nominating and electing directors is radically different from, and contrary to, the only way which the statute prescribes. The decree absolutely prohibits every stockholder of the Canal Company, except the Storage Company itself, from nominating or electing one of the five directors. If a contract or a decree may accomplish this result, upon the same principle, it may take away from every stockholder his right to nominate or elect any of the five directors. The Storage Company, when this decree was rendered, owned 2,000 shares of the stock of the Canal Company. The decree, however, gives to it, whether or not it owns a single share of its stock, the absolute power to nominate two directors of the Canal Company, one of whom must be elected by all the stockholders. The Storage Company may dispose of all the stock it holds, still, by this decree, it would have the absolute right to control the election of one of the directors. On the other hand, it might increase its stock ownership to such an extent, if it has not already done so, that it could, by the cumulative system of voting, elect two of the remaining four directors, and thus, with ownership of a minority of the stock, control the affairs of the corporation through its ability to elect a majority of the directors. Upon the plainest principles of · justice and law, a contract having such effect, is so manifestly unfair to the majority of the stockholders, and, being so plainly contrary to the letter and spirit of a positive and affirmative statute, and the public policy thereby declared, that a court, which sits to administer justice, ought not to sanction or uphold it, but should unhesitatingly declare it void, *per se.*

The Storage Company, however, says that the provision for electing directors, embodied in the 1918 decree, is, in legal effect, not different from an irrevocable proxy, or from a voting trust agreement which a minority or a majority of stockholders of a corporation may make for pooling their stock and thus controlling the corporation,

and that it is not unlike contracts which separate the voting power from stock ownership. The Storage Company says that such contracts, by the weight of authority in this country, are upheld. It is not necessary in reaching our conclusion, to characterize the contract before us, which has been merged into the decree. It partakes of some of the characteristics of each of these devices. It is admitted in argument that when these various agreements were first entered into in this country, they were condemned pretty generally by the courts. Gradually as business expanded and the majority of the stockholders of corporations naturally and properly desired to perpetuate their control, adroit lawyers drew various kinds of contracts to effectuate that purpose which, when sufficiently guarded, met with the approval of some of our courts. For our present purpose we are not required definitely to determine whether any contract of this nature is valid. The authorities are in conflict. Some of our courts from the beginning have condemned them as void *per se,* and still adhere to that doctrine. Some courts have held such contracts valid, when they are made for a lawful purpose, are manifestly fair to all stockholders alike, are calculated to protect the corporate interests; even though they involve the separation, for a reasonable time, of the voting power from beneficial ownership, provided they are based upon a valuable consideration, and coupled with an interest, and where such separation takes the form of a transfer of the stock to trustees, who hold the legal title, or have some beneficial interest in the stock itself; as where the voting power is conferred upon bond-holders, or creditors, who have advanced, or propose to advance, money to the corporation for carrying on its business in consideration of which the right to hold and vote the stock is conferred. Some of the leading cases where such questions are considered, and in which many authorities are collated, are: *Carnagie Trust Co. v. Security L. Ins. Co.,* 111 Va. 1; 68 S. E. 412, 31 L. R. A. (N. S.), 1186; *Winsor v. Commonwealth Coal Co.,* 63 Wash. 62, 114 Pac. 908,

33 L. R. A. (N. S.), 63; *Smith v. San Francisco, etc., Ry. Co.,* 115 Cal. 584, 47 Pac. 582, 35 L. R. A. 309, 56 Amer. St. Rep. 119; *White v. Snell,* 35 Utah, 434, 100 Pac. 927; *Boyer v. Nesbitt,* 227 Pa. St. 398, 76 Atl. 103; *Mobile & O. R. Co. v. Nicholas,* 98 Ala. 92, 12 So. 723; *Brightman v. Bates,* 175 Mass. 105, 55 N. E. 809; *Clark v. Foster,* 98 Wash. 241, 167 Pac. 908; Fletcher, Cyclo. Corp. Vol. 3, Sec. 1707, *et seq.;* 29 Harvard Law Review, p. 434; 18 Columbia Law Review, pp. 123, 136.

In a note to *Morel v. Hoge,* 16 L. R. A. (N. S.), 1136, at page 1140, the doctrine of cases of this character, as to separation of voting power from ownership, has been thus concisely stated:

"Probably the prevailing tendency is toward the view that such an agreement is not *per se* void as against public policy; in other words, that the agreement cannot be declared void irrespective of the propriety of the ultimate purpose to be accomplished, merely because it seeks to accomplish that purpose by means of severing the voting power of the stock from the beneficial ownership thereof."

In the Smith case, (California), in one of the strongest opinions upon the subject, (which is criticized in the notes, 56 Am. St. Rep. 119), the court itself recognizes the soundness of those cases "in which it has been said that the stockholder could not divest himself of the voting power of his stock, and that it should not be separated from the ownership of the stock, were cases which involved either the sufficiency of the agreement by which the voting power was transferred, or the validity of the purpose for which the power was to be exercised."

This seems to be the test applied in a number of the cases cited. Among them which support agreements of this character, we find none which approves of an irrevocable proxy, without limitation as to time, nor has any such agreement been sustained when the transaction contravenes some positive statute or some well established rule of law. The authorities, without exception, say that, where a contract is contrary to the declared public policy

of the state, it is absolutely void and cannot be enforced by either of the parties or sanctioned by a decree of court. The Smith case from California says:

" 'Public policy' is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law."

That being the doctrine of all the cases, so far as we have examined them, this California case is authority for the contention of the Canal Company that this contract which is approved by the decree of 1918, necessarily contravenes the public policy of this state, as declared by the legislature when it emphatically said that directors shall not be elected in any other way than that prescribed by the statute, since the method approved by the decree is an entirely different way.

Of the cases which condemn agreements of this character, some go to the extent of declaring them to be void *per se;* as contrary to public policy; some, on the other hand, say that they are not void *per se.* Some of these leading cases are: *Blue v. Capital Nat. Bank,* 145 Ind. 518, 43 N. E. 655; *Luthy v. Ream,* 270 Ill. 170, 110 N. E. 373; *Durkee v. People,* 155 Ill. 354, 40 N. E. 626; *Shepaug Voting Trust Cases,* 60 Conn. 553, 24 Atl. 32; *Warren v. Pim,* 66 N. J. Eq. 353, 59 Atl. 773; *Clowes v. Miller,* 60 N. J. Eq. 179, 47 Atl. 345; *Kreissl v. Distilling Co.,* 61 N. J. Eq. 5, 47 Atl. 471; *Morel v. Hoge,* 130 Ga. 625, 61 S. E. 487; *Haldeman v. Haldeman,* 176 Ky. 635, 197 S. W. 376; *Harvey v. Linville Imp. Co.,* 118 N. C. 693, 24 S. E. 489; *Bridgers v. First Nat. Bank,* 152 N. C. 293, 67 S. E. 770. See also: 3 Clark & Marshall, Private Corp., p. 2019, *et seq.,* 3 Fletcher Cyclo. Corp., Section 1697, *et seq.*

In the Kreissl case is a long opinion by Mr. Justice Pitney, later a member of the Supreme Court of the United States, in which he condemns these agreements with sever-

ity, and criticises the doctrine of the opposing cases. Under all the authorities as we read them, this contract is void on its face as being in conflict with the public policy of this State declared by our General Assembly in section 865 of the General Incorporation Act. Specifically it is void upon its face, because it purports to confer upon the Storage Company, which has no beneficial ownership in the stock, and which has given to the stockholders no consideration therefor, the irrevocable power for all time to vote the stock, not in the interests of the Canal Company, but in its own interests, which are antagonistic and adverse to the interests of the Canal Company. It is also void upon its face because it purports to give to the minority stockholders the power, for all time, to control the affairs of the Canal Company. The purpose for which the contract was made, thus to perpetuate control, is unlawful in that it is unfair to the stockholders of the company and in favor of a rival corporation which may not own any stock of the Canal Company itself, and if it is a stockholder, the contract discriminates against all other stockholders. Such being our conclusion, it is unnecessary to determine whether all separations of voting power from beneficial ownership, all irrevocable powers of attorney for the voting of the stock, or all voting trust agreements, are invalid. It is clear that this contract, which the 1918 decree has approved, is obnoxious to the principles laid down in the cases upon both sides of this controverted question.

It should be said in conclusion on this branch of the case, that in the article in the Columbia Law Review by Prof. Wormser, who favors agreements of this character, he states that while at first the courts generally looked with disfavor upon them, in the course of time, when the large business interests of the country came under corporate control, the trend of opinion was in their favor, but that now apparently, as indicated by the decision of the Supreme Court of Illinois, in the *Luthy case, supra,* and by the Public Service Commission of Missouri, in its opin-

ion refusing approval of the reorganization scheme of the St. Louis & San Francisco R. R. Co., 3 Mo. Pub. Serv. Com. Rep. 664, 707, the trend is toward the earlier decisions. However that may be, none of the decisions, as we understand them, would sanction such a contract as that now before us. We hold the contract void on its face for the reasons given.

2. The more difficult and important question is, whether the decree of 1918 is void, even though the contract upon which it is based is an absolute nullity. The rule is familiar that where a court has jurisdiction of the subject matter and of the parties, and to pronounce the particular judgment in the given case, its decree, although erroneous, is not void in the sense that it may be impeached, except in a direct proceeding instituted for that purpose. It may be erroneous, or voidable merely, and might be set aside for that reason in a direct proceeding, like a writ of error or appeal, but when called in question collaterally, it is not vulnerable to such attack. It is really not necessary to determine whether the attack here is direct or collateral. However, in *Wilson v. Hawthorne,* 14 Colo. 530, 533, 24 Pac. 548, this Court said that an action brought upon a judgment, pronounced without obtaining jurisdiction of the person of the defendant, may be defeated by a proper answer, under a system of procedure allowing equitable defenses to be interposed in all civil actions, and that the recitals of the record will not be taken to import absolute verity. This means that such an attack is direct, not collateral. In *Hallack v. Loft,* 19 Colo. 74, (34 Pac. 568) at page 83, it is said: "The right to attack a judgment for jurisdictional infirmity, or for fraud, is not confined to the complaint; it extends as well to the answer and replication." That it extends to a demurrer where the infirmity appears affirmatively from the complaint, would seem logically to follow: The doctrine as to void and voidable judgments, is summarized in *Mortgage Trust Co. v. Redd,* 38 Colo. 458, 464, 88 Pac. 473:

"While the right to attack a judgment in a collateral

proceeding for a jurisdictional infirmity—that is, error in assuming jurisdiction—is well settled in this jurisdiction, on the other hand, it is equally well settled that a judgment cannot be questioned collaterally for an error committed in the exercise of jurisdiction."

In *Kavanagh v. Hamilton,* 53 Colo. 157, 125 Pac. 512, this Court, on page 163, in speaking of direct and collateral attacks, says that an equitable action to cancel, or enjoin the enforcement of, a judgment is a direct attack, and that it may be made either by answer or cross-complaint, citing, with approval, *Wilson v. Hawthorne, supra.* If such be the doctrine in this State, it would seem that this ouster proceeding, being an action whose object is to enforce the decree of 1918, may be defeated by a demurrer for jurisdictional infirmity which affirmatively appears on the face of the complaint. The ouster case having been decided on the demurrer, and the contempt on a motion to quash, no evidence was produced. But if this decree is void, it is so on the face of the record, and not because of any showing *de hors* the record. We may then safely assume, but do not decide, that this is a collateral attack. Unless, therefore, the judgment is void on its face, the attack must fail. The complaint, in the ouster case, and the affidavits on which the contempt proceeding is based, upon their face show the true nature of the contract in question, and disclose that the court had not jurisdiction to enter the decree upon a contract which is void as against public policy, which we have already determined the contract to be. It is true that courts generally, in discussing the question of the sacredness of a judgment and its invulnerability to a collateral attack, say that where jurisdiction of the parties and of the subject matter attaches, no mistake, however serious in its character, thereafter committed by the court in the exercise of its unquestioned jurisdiction of the parties and the subject matter, can be taken advantage of in a collateral attack. This doctrine was announced in the *Kavanagh case, supra; Stokes v. Kingsbury,* 63 Colo. 27, 164 Pac. 313, and many other cases

in this Court; *Board of Commissioners v. Platt,* 79 Fed. 567; *U. S. v. Ness,* 230 Fed. 950, 963, citing many authorities. The statement of the rule in most of the cases is that if the court has jurisdiction of the subject matter and of the parties, no error in exercising that jurisdiction may be urged collaterally. Such statement is sufficiently exact in those cases, as the objections there urged go only to these two elements of jurisdiction. But there is another element of equal importance. Jurisdiction, in its fullest sense, is not restricted to the subject matter and the parties. If the court lacks jurisdiction to render, or exceeds its jurisdiction in rendering, the particular judgment in the particular case, such judgment is subject to collateral attack, even though the court had jurisdiction of the parties and of the subject matter. This meaning of jurisdiction is recognized by this Court in: *Smith v. People,* 2 Colo. App. 99, 29 Pac. 924; *Newman v. Bullock,* 23 Colo. 217, 47 Pac. 379; *Tebbetts v. People,* 31 Colo. 461, 73 Pac. 869; *Tegeler v. Schneider,* 49 Colo. 574, 114 Pac. 288; *Kilker v. People,* 68 Colo. 174, 188 Pac. 744. The Supreme Court of the United States, the ultimate authority, has so ruled in: *Windsor v. McVeigh,* 93 U. S. 274, *Ex parte Rowland,* 104 U. S. 604, *Ex parte Lange,* 18 Wallace, 163. See also: *Hovey v. Elliott,* 145 N. Y. 126, 39 N. E. 841, (S. C. 167 U. S., 409), 39 L. R. A. 449, and notes.

These cases from the Supreme Court of the United States, counsel for the Storage Company says, are based upon the proposition that the judgments there condemned as void, were so because the court pronouncing them exceeded its jurisdiction in that the ordinary procedure prescribed by law for such cases, was not observed. That may be true, but the legal principles laid down in those cases are just as applicable to judgments which are in excess of the power of a court to render as to judgments where there is a departure from the established procedure. The highest authority itself has expressly so declared.

It is urged, however, that since a court of equity has jurisdiction of the abstract question of corporate elec-

tions, if it did err in requiring the Canal Company's stockholders to vote for one director as designated by the Storage Company, its error was committed, not in assuming a jurisdiction it did not have, but in exercising a jurisdiction which it possessed. We do not agree with the major premise. A court of equity does not have inherent general or unlimited jurisdiction of the abstract question of corporate elections. 10 Cyc. 347. Neither has our Constitution nor any statute conferred such jurisdiction. A court of equity has only a qualified jurisdiction of supervision and regulation. While it may supervise, and in doing so, may prescribe certain rules to be observed in the conduct of an election, its power in that respect is restricted to directions which are in accordance with the statute law, if any, prescribing the way in which directors may be elected. It has no power to direct a stockholder to vote for a director not according to his own judgment, but as some third party or the court directs, and in nominating and electing directors, it has not the power to require a stockholder to proceed in a way which is expressly prohibited by law. Let us apply the rule to the concrete question in the case before us. Corporations may not do business in this state without permission of our General Assembly. It may prescribe the conditions upon which corporations may do business, and it is exclusively within its power, if it sees fit in the interest of good morals, or the public interests, to prescribe that, in nominating and voting for directors, the stockholders shall proceed in a certain way. Our General Assembly has said, in section 865, *supra,* what that way is, and has also said that the election of directors shall not be in any other way. That declaration of public policy it is competent for the General Assembly to make, and it only has such power. This operates as a restriction upon the jurisdiction of a court of equity, under its qualified power to supervise and control corporate elections, and it has no jurisdiction, under the guise of supervision or regulation, to direct the stockholders to proceed in electing directors in any other way

than that which the General Assembly itself has provided. The principle is illustrated in the case of *Windsor v. Mc-Veigh, supra,* at page 282, where Justice Field, in referring to a similar contention made in that case, said:

"The doctrine invoked by counsel, that, where a court has once acquired jurisdiction, it has a right to decide every question which arises in the cause, and its judgment, however, erroneous, cannot be collaterally assailed, is undoubtedly correct as a general proposition, but, like all general propositions, is subject to many qualifications in its application. * * * If the action be for a libel or personal tort, the court cannot order in the case a specific performance of a contract. If the action be for the possession of real property, the court is powerless to admit in the case the probate of a will. * * * The doctrine stated by counsel is only correct when the court proceeds, after acquiring jurisdiction of the cause, according to the established modes governing the class to which the case belongs, and does not transcend, in the extent or character of its judgment, the law which is applicable to it."

The doctrine of this case was expressly recognized, and applied, in *Hovey v. Elliott,* 167 U. S. 409, 446, affirming the judgment of the Court of Appeals of New York, 145 N. Y. 126. The Supreme Court said that the Hovey case is within the principle of the decision in *Windsor v. McVeigh, supra.* The notes to the Hovey case, 39 L. R. A. 449, contain a good discussion of the subject. It is now the better and prevailing doctrine in this country that though a court has jurisdiction of the parties and subject matter, it "is still limited in its modes of procedure and in the extent and character of its judgments." *Ex parte* Lange, *supra,* and *Ex Parte* Rowland, *supra,* are to the same effect. This doctrine is applicable to the facts of this case and makes the judgment of the Prowers county district court one which, in its extent and character, transcends the law which is applicable to it.

A further illustration is afforded by our chapter on injunctions. A mandatory writ of injunction may be issued only after notice. A court of equity has general jurisdiction of the subject matter of injunctions. Its jurisdiction is limited by this act, in granting mandatory writs, to cases where previous notice is given, and an injunction issued without notice, is absolutely void and the party so enjoined is not guilty of contempt in disregarding it, even though the court issuing it had jurisdiction of his person and of the subject matter. The court, however, has not the power to render the particular judgment in the given case, because, by the statute itself, the jurisdiction of the court did not exist, except in cases where previous notice is given. *Smith v. People, supra.*

It is also said that a contract, or a decree enforcing a contract, which is prohibited by statute, is not necessarily wholly void. In *Catlin v. Christie,* 15 Colo. App. 291, (63 Pac. 328), at page 295, it is said:

"It has been repeatedly held that contracts made in violation of this statutory provision, which exists generally in the states having a public school system, are wholly void. Any attempted act of the school board in contravention of this section is absolutely null and of no effect."

But in *Casserleigh v. Wood,* 14 Colo. App. 265 (59 Pac. 1024) at page 272, the court says:

"It has been held in this state, following the United States supreme court, that a contract to do a thing prohibited by statute is not necessarily void if the statute visit the unlawful act with a penalty; if the thing prohibited is *malum in se,* the contract will not be enforced, not because of the statutory prohibition, but because of its being against public policy and good morals."

The same observation was made by us in the same case, in 30 Colo. 287, 291, 71 Pac. 360. Stated otherwise, the rule is that where the law itself provides a penalty for its violation, and it is manifest that the legislature intended that no other or further consequence should attend its violation, then a contract against the positive prohibition

of a statute is not wholly void. When, however, as in this case, the legislature has not provided a penalty, and where the act prohibited is an expression of the public policy of the state, as against good morals and the public interests, a contract in violation of the statute is wholly void and may not be enforced, and a decree purporting to enforce it does not impart any validity to it and the same may be taken advantage of in a collateral attack.

In an action between this Storage Company and this Canal Company, reported in 173 Fed. 601, this very contract was submitted to the court for decision, but the Circuit Court of Appeals, in an able opinion by Circuit Judge Hook, declined to pass upon it, because it concerned the rights of the stockholders as such, and as contradistinguished from the rights of the corporation, and since the stockholders were not parties to that suit, the question could not be determined in their absence. However, the court at considerable length, clearly indicated that it was against public policy. After stating that: "Were it not complicated by the orders of the state court respecting the making of the contract, it would be an interesting question whether the provision relating to the designation of directors is consistent with public policy," the Court proceeded to say:

"That a part of its governing board should, under mere contract to that effect, be dictated by another corporation, irrespective of any stockholding interest, at once attracts attention. * * *

It is altogether right for corporations to contract for the joint control and management of properties upon which each has expended its funds and in the operation of which they are mutually interested; but it is not usually done by allowing one to dictate the selection of members of the other's board of directors, which under the law (Rev. Stat. 1908, § 865) has the management of its corporate affairs, its duties to the state and its own stockholders, and its business relations with other corporations. Such a course is quite distinguishable from the pooling by stockholders

of their stock for a lawful purpose, or the creation of a voting trust for a limited time, such as have been upheld by some of the courts.

\* \* \* the contract purports to give defendant the perpetual right to nominate two of its five directors. The effect in this particular case would be to give defendant, \* \* \* the power to dominate and control the complainant, so far as a board of directors can do so; for the record shows that, aside from the provision in the contract, the defendant was enabled, by a cumulative voting of stock which it controlled, to elect as members of complainant's board of directors two persons whom it had not nominated under the contract. \* \* \*

The statute of Colorado, (Section 865, *supra*,) provides that each stockholder shall have the right to nominate directors to be voted for, and that he shall have the right to vote the number of shares held by him for as many directors as are to be chosen, or may cumulate the same upon one or more candidates. It is also specifically provided that the directors shall not be elected in any other way. Under such a statute the selection of the directors of a corporation belongs to the stockholders as such. \* \* \* The right to vote for directors and the measure of it are specifically prescribed by the law under which complainant was organized, and do not proceed from any act, contract, or by-law of the corporation. In *Brewster v. Hartley,* 37 Cal. 15, 99 Am. Dec. 237, it was said:

'The exercise of this power having been regulated by the statute, the corporation cannot, by its by-laws, resolutions, or contracts, either give or take it away. \* \* \* the statute having expressly declared who shall be entitled to vote for directors, its provisions are imperative upon the corporation, constituting a part of the law of its being, and the corporation has no authority to extend or limit the right as regulated by the statute.' "

The court also said that the clause of this very contract is in effect a limitation upon the right conferred by the Colorado statute upon the stockholders. We have not

found that the complication referred to prevents us from giving effect to "public policy." It would seem also, from the foregoing excerpts, that had the stockholders been parties to the suit in the Circuit Court of Appeals, that Court would not have been seriously embarrassed by the complication resulting from the orders of the State Court respecting the making of the original contracts, and would have reached the same conclusion that we have in this case. If the contract is void on its face, as contrary to public policy, it necessarily follows that a decree of a court which assumed to enforce it, is itself absolutely void as beyond its jurisdiction to render, and may be collaterally attacked and impeached in these two cases before us. The decree "transcends in its extent and character the law which is applicable to it." The judgment of the district court, being in accord with our views, is affirmed.

MR. CHIEF JUSTICE SCOTT, MR. JUSTICE ALLEN and MR. JUSTICE WHITFORD concur in the opinion. MR. JUSTICE TELLER, MR. JUSTICE DENISON and MR. JUSTICE BURKE concur in the conclusion.

MR. JUSTICE DENISON specially concurring.

I agree that the *contract* is unlawful and that it may be declared to be invalid in a suit like the present. I think, however, that the court had jurisdiction to render the decree of 1918, and that the reasons given for lack of jurisdiction are insufficient.

The effect of the argument on page 497 is that the court had no jurisdiction to direct an election of directors according to the contract in question because the law prescribes a method, forbids others, and the contract's method is not that which is prescribed. This involves the premise that the court has no jurisdiction to direct anything to be done contrary to law, does it not? The conclusion, then, is based on the major premise that whatever a court orders that is unlawful is beyond its jurisdiction and *void*. But to render a decree contrary to law is mere error. All erroneous judgments do what the law forbids.

But the opinion does more; it says that whatever the court orders that is against public policy is beyond its jurisdiction. May a litigant answer a citation for contempt by saying that the order he disobeyed is against public policy?

The illustration of the mandatory injunction (p. 507) is not apt, because the requirement of notice for such injunction is a restriction on the power of *the court,* not on the power of the *litigant,* to act.

*Tegeler v. Schneider,* cited in the majority opinion, was a suit in eminent domain to condemn a right of way for a ditch. The court enjoined the obstruction or interference with the flow of waste water claimed by plaintiff in the lateral whence the said ditch drew its water. Held beyond jurisdiction. Of course. Such a question was not involved in the case. The court had never acquired jurisdiction of the parties upon it.

The dictum in the opinion in *Kilker v. People,* 68 Colo. 174, 178, 188 Pac. 744, that a court has "no jurisdiction to punish him for contempt in doing what he had a right to do" is, of course, a misuse of words. The question of jurisdiction was not before the court, but only whether the acts of the respondent constituted contempt.

*Tebbetts v. People* held that an injunction against the board of aldermen was void because the court was without jurisdiction to control the action of the board, i. e., it had no jurisdiction of the subject matter.

In *Newman v. Bullock* the court states the law with absolute accuracy, that a court has no jurisdiction to decide matters which the parties neither submitted nor intended to submit for decision.

The statement that the court must, in addition to jurisdiction of the parties and of the subject matter, have jurisdiction of the particular question which it assumes to decide is true but inaccurate, or perhaps, rather, incomplete, because, if it has jurisdiction of the parties and subject matter, it has jurisdiction of whatever is involved in the controversy which those parties have brought before

it in a proper manner. If in any such action or suit it has not jurisdiction of any given matter, it is because it has not jurisdiction of the parties for that particular matter. The question then is basically one of jurisdiction of parties. In a suit on promissory note No. 1, the court has no jurisdiction to render judgment on promissory note No. 2. Why? Because it has never acquired jurisdiction of the parties for that purpose. In the decree of 1918, the adjustment of the present questions was the very matter before the court.

But I agree with Judge Hook's position, 173 Fed. 601, that the decree of 1918 concerned the rights of the stockholders as distinguished from the rights of the corporation, and on that principle I conclude that the decree was without jurisdiction except as to the stockholders who actually appeared or were personally served in the action in which that decree was rendered, that any other stockholder may have its enforcement enjoined in equity, or perhaps have it changed or annulled by bill of review and that it is such a unity that when annulled as to one stockholder it can be enforced by none. I consequently concur in the result. I am permitted to say that Chief Justice Teller and Mr. Justice Burke agree with this opinion.