No. 12,954.

DENVER LAND COMPANY *v.* MOFFAT TUNNEL IMPROVEMENT
DISTRICT ET AL.
(18 P. [2d] 455)

Decided December 19, 1932.   Rehearing denied January 7, 1933.

44

Messrs. GRANT, ELLIS, SHAFROTH & TOLL, for plaintiff in error.

Messrs. HUGHES & DORSEY, Messrs. MONTGOMERY & MYER, Messrs. FILLIUS, FILLIUS & WINTERS, Messrs. RHOADS & SEEMAN, for defendants in error.

Mr. JAMES D. PARRIOTT, Mr. FREDERICK P. CRANSTON, Mr. JAMES H. PERSHING, amici curiae.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

THE Denver Land Company, a Colorado corporation, owning property subject to taxation under the Moffat

Tunnel Act (S. L. of '22, c. 2, p. 88), for itself and others similarly situated, on June 23, 1928, instituted an action in the Denver district court against the Moffat Tunnel Improvement District and its officers seeking to enjoin the collection of assessments made to pay certain amounts due upon so-called ''supplemental bonds of the district'' which were charged to be invalid because issued without authority of law. (Plaintiff did not seek a temporary injunction restraining this collection; none was ordered and the district proceeded to collect assessments then and subsequently made. On August 1, 1930, the commission had collected $776,560.28 for such purposes and this ''supplemental bond fund'' now exceeds $1,-700,000.)

On October 6, 1928, Judge Robert G. Smith of the eighth judicial district, most of which lies without the Moffat Tunnel District, sitting in the Denver district court construed the Moffat Tunnel Act and held that the tunnel commission was thereby not only authorized, but commanded, to build a tunnel and clothed with all power necessary to that end; that the limit of indebtedness for this purpose was not $6,720,000, the amount of negotiable bonds authorized by section 10 (a), but the amount of appraised benefits, $43,000,000, and that the $8,750,000 of supplemental bonds, the proceeds of which were used to complete the tunnel, the total cost thereof being $15,-470,000, were valid. Judgment of dismissal was thereupon entered.

On January 20, 1930, upon writ of error, this court held (Denver Co. v. Moffat Tunnel Dist., 87 Colo. 1, 6, 284 Pac. 339) that the lower court was without jurisdiction to determine the validity of said supplemental bonds in the absence of bondholder litigants or a showing why such could not be made parties, reversed the judgment and remanded the cause with directions to make holders of supplemental bonds parties defendant and ''to issue its injunction restraining the Moffat Tunnel Improvement District, a body corporate, and the commissioners

of the Moffat tunnel commission, their agents, attorneys and employees, and all persons acting under their direction and control from paying out or otherwise disposing of any funds in their possession, realized from special assessments, for the purpose of paying interest on $8,-750,000 Moffat tunnel supplemental bonds, all until such time as this case shall be fully and finally determined; that the cause be retried upon the issues presented, and judgment rendered not inconsistent with the views herein expressed." On February 1, 1930, pursuant to this direction, the district court entered such order.

Thereafter two supplemental complaints were filed and the American National Bank, as trustee, the International Trust Company, as trustee, Larry Maroney and the Supreme Camp of American Woodmen, a Colorado corporation, alleged owners of supplemental bonds, were joined as parties defendant. On January 30, 1931, the supplemental bond fund was ordered paid into the registry of the district court. This order was not complied with and on February 13, 1931, was modified, the tunnel commissioners being appointed custodians of said fund and as such permitted to retain it subject to further order of the court.

On June 26, 1931, the district court, this time speaking through Judge E. V. Holland of the Denver district, again sustained the validity of the supplemental bonds and dismissed the action and all injunctive orders. At the request of plaintiff, this judgment was stayed until December 23, 1931, upon which date it became finally effective. To review this second judgment of dismissal, this writ is now prosecuted.

On April 11, 1932, the American National Bank, as trustee, the International Trust Company, as trustee, and the Supreme Camp of American Woodmen, filed in this court a plea seeking to bar further action herein and a dismissal of the writ of error. The plea recites the pleadings and issues in a suit instituted August 19, 1930, by other supplemental bondholders against the Moffat

Tunnel District in the United States district court for the district of Colorado (No. 9312, commonly called the Boynton suit); the injunctive order entered therein on February 4, 1931, restraining the tunnel commission from disposing of the supplemental bond fund; the judgment of dismissal, the appeal therefrom, and the decree of the United States circuit court of appeals for the tenth district (*Boynton v. Moffat Tunnel Improvement Dist.*, 57 Fed. (2d) 772, certiorari denied October 10th, 1932) reversing the judgment of the federal district court; sustaining the validity of said bonds and ordering the Moffat tunnel commission to disburse the supplemental bond fund pursuant to the prayer of the complaint.

On November 21, 1932, a supplemental joint and several plea in bar was filed adopting all of the allegations of the joint and several plea in bar and reciting that on November 17, 1932, the United States district court entered its decree pursuant to the prayer of the complaint and in strict accord with the decree rendered by the circuit court of appeals.

Thus, it is claimed that this judgment of the United States circuit court of appeals, the third adjudication of the validity of the supplemental bonds, and the decree of the United States district court entered at the direction thereof, are conclusive here and estop the Denver Land Company, the plaintiff in error herein, from further asserting their invalidity. If the plea in bar is good, the writ of error must be dismissed, otherwise not.

The character and extent of the jurisdiction of both courts have been disputed from the inception of each case, the Denver Land Company contending that the state court had exclusive jurisdiction because its suit was filed first and the bondholder litigants in each court claiming otherwise.

The United States district court held that the state court had jurisdiction and dismissed the action. The circuit court of appeals reversed this decision, decreed that the federal court had jurisdiction and could and

48

should proceed, and it thereupon determined that the Moffat tunnel supplemental bonds were valid. The decree of the United States district court entered pursuant to this mandate has now become final.

■ The circuit court of appeals in *Boynton v. Moffat Tunnel Improvement Dist., supra,* through Judge McDermott, after a complete recital of facts, states on page 777:

"The plaintiffs and interveners have invested $6,-677,000 in the obligations of the Moffat Tunnel district. Their money has been expended in the construction of the tunnel. They have not been paid their interest as it became due, although taxes have been collected for that purpose. They have come into a court of competent jurisdiction, presented their grievances, and have asked for a hearing. They are stopped at the threshold, and their bill dismissed. The Constitution of the United States (article 3, §2) confers upon courts of the United States the power to determine controversies between citizens of different states, and to cases arising under the Constitution. The statutes of the United Sates (Jud. Code §24 [28 USCA §41]) confer upon those situated, as are these plaintiffs, the right to invoke that jurisdiction. They have invoked it. It becomes then the duty of the federal court to hear and determine the controversy, unless the established principles of law relieve such court of that duty. The trial court found, at the time it dismissed the cause, that the state court had such exclusive control of the res that the federal court might not proceed. At that time, the custodial order of February 13, 1931, was in force. It is no longer in force, and since appeals in equity are trials de novo, and since equity speaks as of the present (*Richardson v. Green* [C. C. A. 9] 61 F. 423; *City of Denver v. Mercantile Trust Co.* [C. C. A. 8] 201 F. 790; 21 C. J. 663), we need not explore the effect of that order. Our task is to determine, upon the facts drawn onto the record by stipulation of the parties, whether the cause should stand dismissed, whether it should be reinstated and stayed, or

whether the plaintiffs are entitled to a decree at our hands, on the record.

*     *     *

"No question arises when the actions in the two courts are in personam; both may proceed; when one has gone to judgment, the judgment may be set up in the other action. It does not matter that both may involve the same controversy, for 'a controversy is not a thing.' *Kline v. Burke Constr. Co.*, 260 U. S. 226, 230, 43 S. Ct. 79, 81, 67 L. Ed. 226, 24 A. L. R. 1077. The question arises when the action in one or the other court is in rem, and when it may be that the force of the court's decree will be exerted against specific property, and not alone against a person. When that situation exists, certain rules have been evolved designed to prevent a struggle between the officers of two courts for possession of, or control over, a thing. These rules, applicable alone to actions in rem, may be divided into two classes. The first is where one court has reduced the res to its actual possession, in which event the res is withdrawn from, the judicial power of other courts. With that branch of the rule we are not concerned, for there is and can be no claim that the fund is now in the possession of either court. The fund is now, and since the inception of both suits has been, in the possession of the commission. Both courts have issued personal injunctive orders directed to the members of the commission, but neither has reduced the fund to possession. Whether the state district court did at one time reduce the fund to custody is not now material; that order has expired; the Supreme Court of Colorado did not see fit to issue a similar order, but instead issued an injunction against those in possession of the fund.

"We are concerned only with that branch of the rule which deals with the situation where property has not been actually seized by judicial process, but where it may later become necessary in order to effectuate the decree of the court, to seize it. Such suits are those to foreclose

50

mortgages or enforce other specific liens, to administer trusts, to liquidate insolvent estates, and other suits of like nature; the rule is limited, however, to actions which deal either actually or potentially with specific property or objects (citing cases). Such actions are often designated, perhaps unhappily, as 'quasi in rem,' in order to distinguish them from the first class, which are designated as actions 'in rem.' Both in fact are actions in rem; in the first instance, possession of the res is actual, and, in the latter, potential. The federal court action falls within the latter classification; it is a suit to administer a trust in a specific res, the supplemental bond fund; plaintiffs assert an interest in that fund and pray for a receiver thereof; any decree rendered in favor of plaintiffs will operate on the fund. The action in the state court did not originally have to do with the res involved in this action, for it was not then in existence. If it was an action in rem at all, which we need not decide, it was because of its prayer to remove a cloud from the title of an entirely different res, to-wit, real estate owned by plaintiff.      *      *      *

"The rule that as between two actions quasi in rem the one first filed excludes the later one is subject to an important and well settled qualification, to-wit, that the two actions shall invoke the same jurisdiction. This qualification is essential to the administration of justice; except for it, a stockholder could apply for a receiver and either indefinitely postpone relief to creditors or bondholders, or could require them to come to the court of the stockholder's selection."

Then follows a discussion of the rules to the same effect announced in *Harkin v. Brundage,* 276 U. S. 36, 48 S. Ct. 268, 271, 72 L. Ed. 457; *Empire Trust Co. v. Brooks* (C. C. A. 5) 232 F. 641; *McClellan v. Carland,* 217 U. S. 268, 30 S. Ct. 501, 54 L. Ed. 762; *Pacific Live Stock Co. v. Lewis, et al.,* (Oregon Water Bd.) 241 U. S. 440, 447, 36 S. Ct. 637, 641, 60 L. Ed. 1084 and *Ingram v. Jones,* 47 F. (2d) 135.

The opinion then continues:

"There remains but to apply the rule. The plaintiffs herein are not parties to the state court suit, and that court cannot grant them the relief to which they are entitled. It is no answer to suggest that they might intervene in the state court; they have not, and are not required to. Our court, as apparently has the Colorado Supreme Court, has squarely held that the right to proceeds of taxes levied to pay bonds cannot be determined in the absence of the bondholders. *St. Louis, etc. Ry. Co. v. Blake* (C. C. A.) 36 F. (2d) 652; *Denver Land Co. v. Moffat Tunnel Imp. District,* 87 Colo. 1, 284 P. 339. No attempt had been made, when this action was brought, to bring the plaintiffs into the state court suit, if that could have been done.

\*      \*      \*

"Furthermore, the issues in the state court suit are not identical with the issues in this case; the most that can be said is that one issue in that suit is identical with one issue in this. The state court suit is an ordinary taxpayer's suit to relieve its property from a threatened tax lien; the issue in this suit is to recover on bonds, with no reference to what particular piece of property is assessed therefor. If the state court suit bars this action, then no bondholder can ever sue to recover on his bond as long as any taxpayer's suit is pending anywhere in the district. The result would be that municipal obligations could be successfully repudiated by the mere device of a succession of taxpayer's suits. This cannot be, and is not, the law. There is a much more striking difference between these actions than existed in the cited cases; and in addition thereto, as Judge Sanborn has said, the plaintiffs herein have never been and are not 'parties to the litigation of those issues in the state courts.' The court below first acquired jurisdiction to adjudicate the claims of these plaintiffs, and, again to use Judge Sanborn's language, 'the pendency of that litigation in the state court does not relieve the court below of its duty to proceed

52

with all convenient speed to determine the issues in the suit before it.'

"It has been repeatedly and conclusively determined that a decree of any court, state or federal, adjudging bonds to be invalid, is binding only upon bondholders who are parties thereto. That was the principle applied by the Colorado Supreme Court when it ordered that they be brought into the state court suit as parties, before further action by the state court. Bondholders' rights could not be adjudicated until the court acquired jurisdiction over them, and until they were notified and given an opportunity to be heard, for such are the requisites of the due process guaranteed to every citizen by the Constitution of the United States, and that is what the state Supreme Court said must be done before the trial court could proceed against them. If, therefore, this case should be stayed or dismissed, and the state court should ultimately determine the bonds to be invalid, this suit must then proceed, or, if again brought, the court in which it should be brought, national or state, must then determine the validity of the bonds of the plaintiffs and interveners in this action." (Citing and discussing authorities.)

"It should not be understood, from what has been said, that there is any difference in the power possessed by the state and national courts. Each has power to render binding judgments on parties properly before it; neither has power to bind parties who are not before it, as the Colorado Supreme Court has ruled in this particular case. A final decree in the state court suit would be persuasive authority in this court, but it would not be res judicata as to the parties in this case who are not parties in that; neither would a decree of this court be res judicata as to parties in the state court who are not parties here; and different issues are, to a considerable extent, presented in the two courts. The rules to which we have adverted are alike applicable to the courts of the two sovereignties.

"One other reason, not so fundamental, why this action should proceed, may be mentioned. The conflict of jurisdictions which is here asserted cannot stand upon the relief sought by the pleadings in the two courts, because the pleadings do not concern the same res; the state court suit is one to remove a cloud from real estate; in the federal court suit, the res is the fund. The conflict, if there be one, must stand upon the interlocutory orders issued by the state courts and directed at the fund, which were outstanding when this suit was filed. But all such orders expired on December 23, 1931. Between that day and December 31, there was an interregnum in which no state court order was in effect; during that period, the federal court order was in effect; it was therefore in effect when the present order of December 31 was made, and of course prior thereto. Both state and federal court suits stood dismissed; both were on appeal, but jurisdiction over the fund was retained by the federal court, and relinquished by the state court. It is not disputed that the federal court action is one quasi in rem; even if its jurisdiction was suspended by the state court orders, which we have otherwise held, it nevertheless would be true that, upon the expiration of the state court orders, the federal court jurisdiction would immediately revive and attach, and could not thereafter be ousted by a subsequent order.

"The pendency of the taxpayer's suit was, therefore, no sound reason why this suit on the bonds should be dismissed. The defendants then assert that jurisdiction was ousted because the trial court permitted a resident bondholder to intervene, with the result that there is no diversity of citizenship between intervener and defendants. The plaintiffs are all nonresidents; they exercised their statutory right to sue in the federal court. Their right to relief, properly asserted, cannot be denied because the trial court permitted a resident to intervene. *Supreme Tribe of Ben-Hur v. Cauble*, 255 U. S. 356, 41 S. Ct. 338, 65 L. Ed. 673. Furthermore, plaintiffs pre-

sent a substantial, and not a colorable, federal question when they contend that an order of the state court, issued in a case to which they are not parties and of which they had no notice, deprived them of the interest due on their bonds, and seriously affected the value thereof. Nor is the contention sound that this suit is not of equitable cognizance. It seeks to impress an existing fund with a trust, asks for a receiver and an accounting, and for a mandatory injunction as to future levies. These are for the equity side of the court. Other objections to the jurisdiction of the court have been examined and found to be without merit.

"There remains but one question, Are the bonds valid? In the trial court, their validity was denied by counsel for the Denver Land Company, appearing amicus curiae. The underlying question of the statutory power of the commission to construct a tunnel costing in excess of $6,720,000, without further legislative authority, was ably argued to this court in the lease case, *Moffat Tunnel Improvement District v. Denver & Salt Lake Ry. Co.*, 45 F. (2d) 715, 720, 729, certiorari denied, 283 U. S. 837, 51 S. Ct. 485, 75 L. Ed. 1448, and we there had occasion to analyze the statute. We concluded that the legislative direction to build this tunnel at a designated place was a command, and not a mere authority; that the principal object of the act was the construction of the tunnel: that the powers of the commission were broad enough to accomplish this underlying purpose; from a comparison of earlier acts, and the legisative history of this act, we reached the conclusion that the statute did not contemplate an abandonment of the project if the tunnel was incomplete when the first issue of bonds was exhausted. The legislature, in common with all mankind, must have appreciated the fact that no one could forecast with accuracy the underground conditions that might be met in the course of constructing a tunnel of this length; the cost could not therefore be estimated with accuracy. Certainly the legislature did not contemplate the expenditure

of more than $6,000,000 of taxpayers' money on a worthless hole in the ground. In that opinion we held: 'It is true that the Act authorizes the issuance of $6,720,000 of bonds to pay for the construction of the tunnel; the Act of 1919, submitting the amendment to construct this tunnel, provided for the issuance of bonds, but further provided that 'Any contract or liability attempted to be entered into or created, in excess of the amount realized from the sale of said bonds, shall be void.' The Legislature of 1922 must have been familiar with the 1919 Act, and the omission of such a clause should not be charged to inadvertence. Moreover, it is a matter of common knowledge that school buildings, courthouses and other public improvements are constantly being erected and paid for in part by bonds, and in part from building funds, current assessments or from other sources. Again, the statute expressly gives the Commission power to levy assessments upon real estate in the District 'for the purposes provided in this act (section 11), the principal one of which was the construction of a tunnel; as well as power to levy assessments to pay interest on and retire the bonds (section 13). So the hypothesis that the Act contemplates only a tunnel costing $6,720,000 is unsound.'

"Two of the learned judges of the state district courts have examined the question at length and independently. Both reached the conclusion that the bonds were valid. We have read these opinions and fully concur therein, as far as they deal with the question before us. Judge Smith concluded his opinion as follows:

" 'It could not be implied that the legislature intended to circumvent the very purpose of the Act, i. e., the building of the tunnel, which it has ordered the construction thereof, and neither it nor the Constitution has prohibited the employment of those means necessary to the execution of its order.

" 'When the proceeds of the bond issue of July 1, 1923, were exhausted, the tunnel was less than half finished. Had the Board abandoned its task at that point, all of

its previous effort and the immense sum of money already expended would have been a total loss. Even a few months delay would have been well nigh fatal. Of course had the Legislature expressly prohibited the expenditure of more than $6,720,000, any further expenditure would have been illegal, but no such prohibition can be found in the law, and the express mandate to construct the tunnel is inconsistent with any such limitation, by implication, upon the powers expressly granted, so the Board determined, after taking advice, as is conceded, not only from their own attorneys, but from other leading attorneys in this state as well as outside of the state, that it should provide for levies against the property in the district, for the purpose of paying the additional expenses and would anticipate those levies by issuing securities extending over a period of years in order to relieve the immediate burden of the taxpayers, and to prevent the danger of, if not the actual loss, of the sums theretofore expended. It not being disputed that the cost of the tunnel must be paid by assessments, the only real question remaining is whether this shall be paid for in cash, or whether the taxpayers shall have the benefit of spreading it over a number of years, and there being nothing in our Constitution, or in the Tunnel Act which prevents the Board from doing what it did, it would seem their action should be sustained.'

"We are, therefore, of the opinion that the bonds are valid, and the plaintiffs are entitled to relief. It follows that the decree of the trial court must be reversed, and the cause remanded, with directions to enter a decree for plaintiffs as prayed for."

We agree with and adopt the foregoing decision in so far as it relates to the question of jurisdiction. Nonresident bondholders unquestionably had the right to invoke the jurisdiction of the federal court in order to secure the payment of an alleged valid obligation. Even though the action in the state court was instituted first, these bondholders were under no duty to appear therein in order to

protect their rights. Both courts had concurrent coordinate jurisdiction and each was empowered to exercise the particular character of jurisdiction invoked. Each independent of the other was in duty bound to determine the issues involved. The jurisdiction of one court in no event would require a dismissal of the suit in the other. Only when the exercise of the jurisdiction of one interfered with the res possessed by the other would it be necessary for the former to delay action pending the determination in the latter court. If there had been a conflict of jurisdictions in the instant case, such was nonexistent on March 29, 1932, the date of the circuit court of appeals decision, because the only injunctive order then in existence was that made by the United States district court on February 4, 1931.

Having determined that the federal court had jurisdiction to adjudicate the issues presented in the Boynton case and that such adjudication should not have been held in abeyance pending the determination of the issues in the state court and the circuit court of appeals having sustained the validity of the supplemental bonds, it now becomes our duty to determine the effect of such decision here.

In this connection it should be borne in mind that the Moffat tunnel district and its officers were parties defendant in both suits; that the district taxpayers were parties by representation of the Moffat tunnel district in the federal court; that counsel for the Denver Land Company were at all times advised and knew of all steps taken in the Boynton suit and appeared as amici curiae before Judge Symes in that case and also in the tunnel lease case (*Moffat Tunnel Improvement District v. Denver & Salt Lake Ry. Co.*, 45 F. (2d) 715, 283 U. S. 837) and argued the invalidity of the supplemental bonds and that counsel for the land company did not appear and made no arguments in the circuit court of appeals although they had been requested by counsel so to do.

The plea in bar invokes the doctrine of estoppel

by judgment. This rule of law that the same parties may not relitigate a matter theretofore determined in the same or another court is salutary and based upon sound public policy; its liberal and universal application effectively has upheld the stability of our judicial system. Among the Colorado cases on this subject are: *Williams v. Hacker,* 16 Colo. 113, 26 Pac. 143; *Lake County v. Johnson,* 31 Colo. 184, 71 Pac. 1106; *Bijou District v. Ditch Co.,* 67 Colo. 336, 184 Pac. 382; *Albertson v. Clark,* 70 Colo. 129, 197 Pac. 757; *Croke v. Farmers Co.,* 71 Colo. 514, 208 Pac. 466; *James v. James,* 85 Colo. 154, 274 Pac. 816; *Fort v. Bietsch,* 85 Colo. 176, 274 Pac. 812; *London v. Allison,* 87 Colo. 27, 284 Pac. 776; *Murray v. Ready,* 88 Colo. 64, 292 Pac. 87. See also, 2 Freeman on Judgments (5th Ed.) 1317, et seq., §§625, 626.

In the federal court a condition precedent to the right of the bondholders to recover was a judicial determination that the supplemental bonds were valid. In the state court, a condition precedent to the right of the Denver Land Company to the relief sought was a determination that the supplemental bonds were invalid. Thus the paramount question in each case was the validity of said bonds.

Notwithstanding the federal decision was adverse to the contention of the Denver Land Company, here it still insists that this court make another determination favorable to it and consequently adverse to that of the federal court. It claims the plea in bar is not good because: (1) There is no final judgment in the federal court; (2) the taxpayers are not bound; (3) a court has no power to validate a void bond; and (4) the exclusive jurisdiction of the state court is not affected by the federal court decree. These in their order.

1. The brief of counsel for the land company in opposition to the plea in bar was filed about five months before the Supreme Court of the United States refused to take jurisdiction in the Boynton case; the decree of the United States district court entered pursuant to the man-

date of the circuit court of appeals now has become final; therefore, it is unnecessary to further consider or determine what would have been the effect of the judgment of the circuit court of appeals in the absence of the action of the United States Supreme Court.

2. Counsel for the land company contend that the Boynton decree does not bind the taxpayers, because the validity of the supplemental bonds was not an issue and not controverted; the decree was by consent of the parties and the result of fraud or collusion, actual or constructive.

■■■ A careful examination of the pleadings in the Boynton case discloses that although the defendants therein admitted the facts in connection with the issuance of the bonds, they neither admitted nor denied their legal effect but asked ''strict proof thereof.'' This tendered an issue of law calling for the court's determination. Counsel for the land company must have thought the validity of the supplemental bonds was an issue else they would not have appeared before Judge Symes and argued their invalidity. Judge Symes certainly must have so understood, otherwise he would not have permitted such argument. We have held that ''If the matter in question is controverted by the pleadings it will be conclusively presumed to have been litigated.'' *Croke v. Farmers Co.,* 71 Colo. 514, 517, 208 Pac. 466. However, irrespective of this conclusive presumption, the opinion in the Boynton case evidences beyond doubt that the circuit court of appeals considered the validity of the supplemental bonds to be an issue which required determination before relief could be granted to the bondholders. The power to grant such relief necessarily must have included the power to construe the act and determine the validity of the bonds. This being true it would seem to us immaterial whether the validity of the bonds actually was placed in issue by the pleadings, it was an issue of necessity. 2 Freeman on Judgments (5th Ed.) 1470.

■■ The opinion itself conclusively proves that the

60

judgment of the circuit court of appeals was not a consent decree. All facts were admitted there, as here, as they should have been, but the validity of the bonds was not admitted and the court did not assume them to be valid; it determined their validity only after judicial investigations and consideration and in the exercise of its judicial powers.

Counsel concede that in the absence of fraud or collusion, actual or constructive, a judgment against the district binds the taxpayers thereof. The land company at no time charged or sought to prove that the tunnel commissioners were guilty of actual fraud in connection with the matters here involved. The record wholly fails to show that actual fraud existed at any time. At the time the Moffat tunnel bonds were in contemplation, the tunnel was not finished, the original bond issue of $6,-720,000 was almost gone and it was imperative that quick action be taken in order to save the tunnel. Confronted with this great emergency the commissioners did just what any trustworthy and prudent business man would have done. They sought advice of eminent counsel, both here and in the East, municipal and improvement bond specialists of international reputation, who advised them that the Moffat Tunnel Act commanded them to complete the tunnel and authorized them to raise funds therefor not exceeding $43,000,000, the determined benefits. In order to avoid probable injury to workers and damage to the tunnel itself incident to delay, it was necessary to raise this money quickly. The supplemental bonds were prepared, issued and sold and the tunnel completed with the proceeds thereof. Practically all the bonds were sold to nonresidents, concededly innocent purchasers for value and without notice, almost all of whom appear as plaintiffs in the Boynton case.

All proceedings of the Moffat tunnel commission in this connection were open, notorious and widely published. Notwithstanding all the taxpayers of the district were advised of every action taken and although oppor-

tunities were afforded, no complaint or protest of any taxpayer was ever made. Not until this suit was filed, four months after the completion of the tunnel, had any taxpayer asserted the invalidity of the supplemental bonds.

From the record before us, the utmost that can be said against the tunnel commissioners is that they acted upon bad legal advice, but the force of this contention is obliterated by the determination of three courts that such advice was sound. The Moffat tunnel district did not seek the federal forum, they were forced to appear there by bondholders who had an absolute statutory right to have their controversy settled by such tribunal. Counsel for the land company knew every step taken in the federal court. No advantage was taken of them, on the contrary they were given every opportunity and repeatedly requested to appear and be heard in the United States courts. Warned that a judgment there would be urged as an estoppel here, they took this chance and persisted in their refusal to appear. In these circumstances we must hold that the judgment of the circuit court of appeals does not operate as a constructive fraud upon the taxpayers of the tunnel district. 3 Freeman on Judgments (5th Ed.) 2568, §1233; *United States v. Throckmorton,* 98 U. S. 61, 25 L. Ed. 93; *La Fitte v. Salisbury,* 43 Colo. 248, 95 Pac. 1065; *Boldenweck v. Bullis,* 40 Colo. 253, 90 Pac. 634; *Farncomb v. Denver,* 64 Colo. 13, 171 Pac. 66; *Golden Gate Bridge and Highway Dist. v. Felt* (Cal.), 5 Pac. (2d) 585; *Kentucky v. Indiana,* 281 U. S. 163, 50 Sup. Ct. 275, 74 L. Ed. 784; *Holt County v. National Life Ins. Co.,* 80 Fed. 686; *Ashton v. City of Rochester,* 133 N. Y. 187, 30 N. E. 965; *Orcutt v. McGinley,* 96 Nebr. 619, 148 N. W. 586; *Pear v. City of East St. Louis,* 273 Ill. 501, 113 N. E. 60; *Price v. Sixth Dist. Agricultural Ass'n,* 201 Cal. 502, 258 Pac. 387; *Howard-Sevier Rd. Imp. Dist. 1 v. Hunt,* 166 Ark. 62, 265 S. W. 517; *Young v. Town of Henderson,* 76 N. C. 420. The *Golden Gate Bridge and Highway Dist. v. Felt, supra,* involved the

validity of bonds issued for the construction of a suspension bridge across San Francisco bay. The officers of the improvement district claimed the bonds were good. The taxpayers, who said the bonds were illegal, were asked to, but did not, appear in an action brought to determine their validity. Taxpayers claimed this suit was collusive. The court said at page 591 of 5 P. (2d): "Amici curiae were invited by petitioner and by this court to bring their clients into this proceeding by intervention, a procedure which has been heretofore permitted by this court * * *. Opportunity was also offered them, whether they intervened or not, to present to the court as fully as they might deem desirable, their objections to the proposed bond issue. * * * It surely cannot be said that this proceeding was brought to reach a collusive determination of the rights of such third parties, when they were urged to come into court and present their own views of the case.

"We are satisfied that this court may properly determine the issues hereinbefore mentioned, and that our determination will have the usual force and effect of a final judgment on those issues."

3. Counsel argue that "a void bond beyond the power of the corporate body to issue and contrary to the statute cannot be validated by a decree of court and any such decree will not constitute an estoppel by judgment, but may be collaterally attacked—because such decree is beyond the jurisdiction of the court." In other words, the circuit court of appeals was powerless to declare the supplemental bonds valid and its determination is not here conclusive. In support of this position they cite People v. Burke, 72 Colo. 486, 212 Pac. 837. There we held (p. 510), in construing a consent decree validating a contract authorizing the election of directors of a canal company in direct contravention of the law applicable, that "if the contract is void on its face, as contrary to public policy, it necessarily follows that a decree of a court which assumed to enforce it, is itself absolutely

void as beyond its jurisdiction to render, and may be collaterally attacked and impeached in these two cases before us. The decree 'transcends in its extent and character the law which is applicable to it.' '' This case is not here controlling. There it was held that a court had no power to decree a procedure for the election of directors which was obviously, unmistakably and admittedly contrary to specific statutory enactment. Here the validity of the supplmental bonds depended upon a judicial interpretation of the Moffat Tunnel Act, the provisions of which were obviously and unmistakably susceptible of two constructions, one validating the supplemental bonds, the other invalidating them.

Counsel's premise that the bonds are void is unsound. Of course no court can declare a bond valid when it has no jurisdiction so to do or when it appears unquestionably that it is invalid. If the Moffat Tunnel Act had specifically provided, ''No bonds or other evidences of indebtedness of any character whatsoever shall be issued and sold to pay for the tunnel,'' then there might have been some merit in this contention. But the act contains no such provision, on the contrary, it provides: ''Section 6. It *shall be the duty* of the said Board * * * to provide for the construction of and to *construct a transportation tunnel,* * * *.'' ''Section 8. The Board shall have power on behalf of said District: * * * (c). To construct, preserve, operate and maintain, or contract for the construction, preservation, operation, and maintenance of said tunnel and its approaches and all necessary works incidental thereto; * * *'' ''(h). The Board is hereby vested with all powers necessary and requisite for the accomplishment of the purposes for which this District is organized and capable of being delegated by the General Assembly of the State of Colorado; and no enumeration of particular powers hereby granted shall be construed to impair any general grant of power herein contained, nor to limit any such grant to a power or powers of the same class or classes as those so enumerated.'' ''Sec-

tion 10. (a). To pay for the construction of said tunnel, * * * and to pay interest on bonds issued as hereinafter provided for during the period of construction, the Board is *hereby authorized* to issue the *negotiable* bonds of said District in an amount not exceeding * * * $6,720,000.'' The issuance of such bonds was not mandatory, but discretionary. "Section 11. * * * The Board shall have power to levy special assessments upon all real estate within the District, except such real estate as is by this Act exempted, *for the purpose provided in this act*. Such special assessments to be made in proportion to the benefits to each piece of real estate accruing by reason of the improvements herein provided to be made and in accordance with the rules of apportionment to be adopted by the Board.'' "Section 20. *This Act* being necessary to secure and preserve the public health, safety, convenience and welfare, and being necessary for the prevention of loss of life and property and for the progress of the people of said Improvement District, *shall be liberally construed to effect* the purposes of this Act.''

The recital of the foregoing salient provisions of the act would appear to conclusively demonstrate that the act is clearly and reasonably susceptible of two constructions; namely, that the bonds were valid because not in excess of assessed benefits or void because section 10(a) limited the total cost of construction to $6,720,000.

The determination of three courts that the supplemental bonds are good, irrefutably demonstrates that the bonds were not obviously bad and that the tunnel act was reasonably capable of a different construction than that claimed by the land company to be exclusive and conclusive.

We have already determined that the circuit court of appeals had jurisdiction to adjudicate the matters at issue and that the question of the validity of the bonds was there presented. Their validity depended upon a clearly apparent and reasonable construction of the act. Surely under such circumstances it would be improper to

assume that the bonds were void and that being void no court had power to make them valid. To now say that the circuit court of appeals was powerless to decree their validity would annihilate the doctrine of estoppel by judgment. This we cannot do.

4. Counsel urge that the exclusive jurisdiction of the state court is not affected by the circuit court of appeals decree. This jurisdictional question hereinbefore has been considered and determined contrary to counsel's contentions.

For the foregoing reasons we must and do conclude that the circuit court of appeals had jurisdiction to determine the matters at issue therein, including the validity of the supplemental bonds; that it could proceed to such determination notwithstanding the suit in the state court was commenced first; that the Moffat tunnel district and its officers appeared on behalf of and represented in the federal court the taxpayers; that the record fails to disclose any fraud or collusion, actual or constructive, in connection with the Boynton case or the facts involved therein; that the decree there rendered was not by consent of the parties, but was the result of the exercise of a judicial consideration and determination; that the plea in bar is good and, therefore, that the Denver Land Company and those similarly situated should be and are now estopped from further prosecuting this action. Accordingly the plea in bar hereby is ordered sustained and the writ of error dismissed.

MR. JUSTICE CAMPBELL AND MR. JUSTICE BUTLER authorize me to say that they concur in this opinion, and that they do so with less reluctance because, after a consideration of the record and of the elaborate arguments, oral and printed, they have arrived at the conclusion that the so-called supplemental bonds are valid.

MR. JUSTICE BURKE concurs in the conclusion that the plea in bar is good.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE HILLIARD and MR. JUSTICE ALTER dissent.

66

Mr. Chief Justice Adams, dissenting.

I am unable to agree with the opinion and therefore must respectfully dissent. One of the most enervating features of the whole matter is the apparent notion that a "Plea in Bar" can barricade the justices of the Supreme Court of this state out of the court room to the extent of preventing them from having any voice in construing one of the most, if not the most, far reaching acts of public legislation ever passed by our General Assembly. It is no answer to say that even a litigant can thus interfere with the performance of our sacred duty, although we might ultimately conclude to decide against him.

I do not agree with either the reasoning or conclusions in *Boynton v. Moffat Tunnel Improvement Dist.*, 57 Fed. (2d) 772, extensively quoted in the main opinion. It does not divert my attention from section 10, chapter 2, Laws 1922 of the Moffat Tunnel Act, which expressly limits the issuance of authorized bonds in an amount *"not exceeding"* the sum of $6,720,000. (The italics are mine.) I do not conceive that a liberality of construction authorized by the statute means a prodigality of construction beyond the express limitation of the act. I am firmly convinced that supplemental bonds issued in excess thereof are merely an unwarranted "supplement" to the statute, and are consequently void. I do not, however, presume to indulge in any personal criticism of the members of this court or of any other court for expressing their convictions to the contrary.

I should be glad to give further reasons for my dissent, but shall not attempt it at this time; I cannot do justice to the subject in a line. In view of the manifest importance of the case and the imperative necessity for a speedy determination, we must forego further discussion, so that the opinion may be released. Although the parties did not bring the cause to final issue in this court until September 1, 1932, we advanced it on our calendar and it was orally argued before us on September 19th.

The issues are long and complicated, but notwithstanding this, the matter has had the full and prompt consideration of every member of this court.

I think the case should have been decided on its merits, i. e., the question of the validity of the supplemental bonds, but since the operation of the main opinion will be to hold them good without even an independent discussion of the statute under which they are supposed to have been issued, it is obvious that there is nothing further on that score in the opinion that calls for an answer.

I am authorized to say that Mr. Justice Alter agrees with me in this dissent.

MR. JUSTICE HILLIARD, dissenting.

The decision of the court sustaining the plea in bar brings, I presume, an end to the shameful history of the construction and leasing of the Moffat tunnel. Shameful, I say, because as the records and opinions of the courts that have been concerned indicate too plainly, never, either in the deliberations of the tunnel commission or in the courts, were the taxpayers of the district given a reasonable opportunity to be heard. Shameful, I say, because by legal gymnastics the actual issue, the question of the validity of the supplemental bonds, has been foreclosed and the taxpayers and their descendants who will groan for fifty years before this monstrous folly is paid for, have had, and will have, no opportunity, in court or out, to present arguments or evidence that the supplemental bond issues were void. Shameful, I say, because there is every reason to believe, if one is not blinded to the obvious insincerity of most of the actors in this melancholy drama, that the tunnel was conceived in iniquity, constructed in bad faith, and leased without regard to fairness. Those who care to read this record of shame, to observe the adroit maneuvers of men learned in law and skilled in politics, to see for themselves how the taxpayers were betrayed by the only representative permitted them, should examine the records, the briefs

and decisions in *Milheim v. Moffat Tunnel Improvement District*, 72 Colo. 268, 211 Pac. 649; *Milheim v. Moffat Tunnel Improvement District*, 262 U. S. 710, 67 L. Ed. 1194, 43 Sup. Ct. 694; *Denver Land Co. v. Moffat Tunnel Improvement District*, 87 Colo. 1, 284 Pac. 339; *Denver and Salt Lake Railway Co. v. Moffat Tunnel Improvement District*, 35 Fed. (2d) 365; *Moffat Tunnel Improvement District v. Denver and Salt Lake Railway Co.*, 45 Fed. (2d) 715; *Boynton v. Moffat Tunnel Improvement District*, 57 Fed. (2d) 772. I say to read those things and draw such conclusions therefrom as may be warranted. I make no attack upon courts, counsel or commission. I submit only that courts have been misled, that counsel have varied in their respective displays of zeal for their clients, and that the commission has reaped the whirlwind which is the fruit of the wind it sowed.

Before addressing myself to the merits of the plea in bar I think it not improper to consider somewhat of the burden the decision of the court visits for generations upon the taxpayers of the district. If Denver alone is considered—and to the credit of its administration it has appeared here and protested—the figures are staggering. $6,000,000 of the supplemental bonds bear interest at five and one-fourth per cent, an annual amount of $315,000. The remaining $2,750,000 of supplemental bonds bear interest at five per cent, an annual amount of $137,500, making a total interest charge each year of $452,000. Denver, constituting in assessed valuation 90 per cent of the district, in addition to paying finally $7,875,000 of the principal of the supplemental bonds, must contribute each year toward payment of interest the sum of $406,800. And in order that we may plainly see what this imposition means, let it be noted that the annual interest charge alone is almost exactly the amount Denver has fallen short this year in raising what is needed for its starving and freezing people, and is more than twice the sum, $192,000, the city has been obliged to borrow from the federal government for its current

needs, which must also be exacted ultimately from Denver's burdened taxpayers. And the taxpayers outside of Denver, within the district, are likewise relatively oppressed. For understanding of what all must finally pay the tunnel commission has not left us in doubt, for the assessments levied for payment of the supplemental bonds, principal and interest, aggregate $30,498,164.43. To what ends other follies may lead us, based upon the precedents heaped up in the tragic history of the Moffat tunnel, heaven alone has knowledge, and it seems that to heaven alone may the taxpayers look for relief.

The judge who wrote the opinion of the circuit court of appeals in the Boynton case wrought better than he knew, for he may claim the distinction of having written both the opinion of that court and this. And since he was also the author of the decision in *Moffat Tunnel Improvement District v. Denver and Salt Lake Railway Co.,* *supra,* and cited that case as authority for his decision in the Boynton case, he may take credit for having made about all the law in this particular litigation. I can only wish that this court were as brave to defend the jurisdiction of the highest tribunal of a sovereign state as the circuit court has been quick and bold to assert its jurisdiction. If we had been brave then the taxpayers of the district would have had the comfort at least of an examination of the cause on its merits. But instead, when the circuit court appeared over the brow of the hill this court stacked arms and surrendered. And not only that, but we adopt as our own the language of a court that belittles us. And more than that, gravely cite the decision of the circuit court in support of the conclusion that the plea in bar is good when the circuit court very carefully and in terms denies that there is any conflict of jurisdiction and asserts not once but twice that parties not before it are not bound by its decision.

Neither court nor counsel has made any attempt to claim that the decision in the Boynton case is res judicata as to the case at bar. It is too plain that it is not.

But upon the question of estoppel by judgment this court has eagerly asserted that such exists. To make that assertion has required a defense of the acts of the Moffat tunnel commission, and to my mind if it is necessary to urge a defense for that body that fact alone makes it certain that estoppel by judgment does not exist.

The position of the court is that the plaintiff here is estopped, because, forsooth, the Moffat Tunnel Improvement District was a party in the federal court and was representative of all the taxpayers, including the plaintiff. I say that in all the books one will not find a parallel for so astounding a statement. Manifestly, and painfully so, the taxpayers were misrepresented by the Moffat Tunnel Improvement District. Manifestly, the Boynton case was a sham battle. Manifestly, the improvement district made no real attempt to assert the invalidity of the bonds. Manifestly, the commissioners, the managers of the district, desired to have the validity of the bonds sustained for if they were held invalid there was reason in law to believe that the commissioners might become personally liable. It does not require citations to support the view that under such circumstances the taxpayers are not represented by the commission. The commissioners could not very well represent themselves and the taxpayers at the same time when their interests differed sharply.

No, in the face of the facts, it is entirely untrue as fact and unsound as law to say that the improvement district represented the taxpayers. I have not forgotten, although my brethren seem to have, that when this matter was before the court on oral argument counsel for the improvement district sat at the same table with and made the same arguments as counsel for the bondholders. Counsel for the plaintiff, a taxpayer and more certainly a representative of the taxpayers than any one else in that room, sat lonely and alone, belabored alike by the bondholders and the commission. Can one ask for better evidence of constructive fraud upon the part of the com-

mission than the fact that it made no real defense in the federal court and opposed the plaintiff in this cause? And the authorities say that unless the representative shall actively and in good faith plead and prosecute all known defenses that the taxpayers are not bound by the judgment. What should we hold here, when upon the face of the record before us there can be no question that the improvement district utterly failed to assert any of the known defenses, defenses which were set up in this suit and which could have been pleaded in the federal court simply by the exercise of the skill of a copyist? Should we hold that because the district "demanded strict proof" that it has properly represented the taxpayers? I say not, and more, that it has convicted itself of constructive fraud upon the face of the record.

Much is said in the opinion of the court of the failure of the plaintiff to intervene in the federal court. That is to censure counsel for refusing to take the bait and be caught in the trap; in other words, condemning them for doing that which was best for their client. As the circuit court held that the bondholders had a statutory right to bring their case in the federal court and were not obliged to intervene in the state court, so had the plaintiff the right to maintain its action in the state court. Besides, the relief sought by the plaintiff and the relief sought by Boynton were so unlike that neither would have properly been a party in the other's suit. If the plaintiff had intervened in the federal court it would have been subordinated to the issues tendered by the bill of complaint, could obtain no relief such as it prayed for here, and would have run the risk of being bound by an adverse decision.

As I have said, the circuit court found there was no conflict of jurisdiction. At page 782 of the opinion in the Boynton case that court said: "A final decree in the state court suit would be persuasive authority in this court, but it would not be res judicata as to the parties in this case who are not parties in that; neither would a

decree of this court be res judicata as to parties in the state court who are not parties here; and different issues are, to a considerable extent, presented in the two courts."

And at page 781: "Furthermore, the issues in the state court suit are not identical with the issues in this case; the most that can be said is that one issue in that suit is identical with one issue in this. The state court suit is an ordinary taxpayer's suit to relieve its property from a threatened tax lien; the issue in this suit is to recover on bonds, with no reference to what particular piece of property is assessed therefor * * *."

Hence, the circuit court concluded that there was no conflict and entered judgment accordingly. Why has this court been so eager to find that there was conflict, that the issues were the same, that the improvement district represented the taxpayers, including the plaintiff whom it had fought with energy and bitterness for four years? I confess I do not know the answer or even find ground for speculation. We have simply supinely dodged a vexing issue, and left the plaintiff helpless after its four years of effort.

What of the validity of the bonds themselves? As counsel for the plaintiff have very well said in one of their briefs, "Such a bewildering number of cases, theories, briefs, arguments and transcripts have been presented that this court could not be criticized for cutting through the maze of technicalities involved and determining this case by a construction of the Moffat Tunnel Act, which after all has something to do with this litigation." And yet, all that is said in the opinion of the court is that the bonds must be valid because two state district judges have so held and their opinions adopted by the circuit court of appeals. Mr. Justice Butler and Mr. Justice Campbell, sensing, I suspect, the unsoundness of the estoppel by judgment, authorize the announcement by Mr. Justice Moore that it is their belief the bonds are good. And so the taxpayers are con-

demned to pay over $30,000,000, by about as many words as there are millions of dollars involved.

It will do small good for me to elaborate my views on the validity of the bonds. I think them utterly void. They were issued in virtual secrecy. They were issued upon the advice of at least some attorneys who had asserted in the Milheim case that the limitation of $6,720,-000 in the tunnel act meant that only that much money could be spent. They were sold for par or less to a bond house that reaped a golden harvest by selling them at more than par. They were issued, so say the circuit court and the district judges, in light of a positive command from the legislature that the commission *must* build that tunnel. I wonder if the legislature would have passed the tunnel act if it had been known to its members that the tunnel was going to cost in excess of $15,-000,000, or if they had known they were commanding the completion of the tunnel even if it cost $43,000,000? I wonder if it ever occurred to the Moffat tunnel commissioners to apply to the Legislature for additional legislation? The commission knew long before it issued the supplemental bonds that the tunnel could not be completed for the $6,720,000 authorized by law. Three regular sessions of the legislature met between the time the commission was organized and the tunnel completed. At least one and likely two of those sessions came before the supplemental bonds were issued. But instead of consulting the Legislature and making known to the people what financial straits it was in, and how much more money than contemplated was required, the commission employed eminent counsel, both local and foreign, and discovered it must drill that tunnel at any cost short of $44,000,000. So, I say, the arguments in favor of the validity of the bonds, in light of the facts we all know now, are specious. But they are the law, and I can only register my protest that the law has come to such a state. I am constrained to add, however, that as I contemplate the Moffat tunnel scheme in full outline, the visitation of

74

burdens and bestowal of benefits, my sense of outrage fails of adequate expression. In my helplessness I adopt from the United States Supreme Court the following language: "To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprise and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation." *Loan Association v. Topeka*, 20 Wall. 655, 664, 22 L. Ed. 455.

In my opinion the plea in bar should be denied, and the cause reversed with direction to enter judgment for the plaintiff as prayed for.