In re David HIRSCH, Marty, Inc. Pension Plan (By Its Trustee And Beneficiary, Martinury), and Jonathan and Eileen Fussner, derivatively on behalf of Cable TV Fund 12–B, Ltd., Cable TV Fund 12–C, Ltd., and Cable TV Fund 12–D, Ltd., Plaintiffs,

v.

JONES INTERCABLE, INC., Defendant,

and

Cable TV Fund 12–BCD Venture, Cable TV Fund 12–b, Ltd., Cable TV Fund 12–c, Ltd., And Cable TV 12–d, Ltd., Nominal Defendants.

No. 99SA30.

Supreme Court of Colorado,
En Banc.

June 28, 1999.

Wolf & Slatkin, Raymond P. Micklewright, Denver, Colorado, Robert J. Dyer, III, Kip B. Shuman, Denver, Colorado, for Plaintiffs.

Davis, Graham & Stubbs, LLP, John M. Roche, Andrew M. Low, Alan M. Loeb, Denver, Colorado, Attorneys for Defendant.

Justice KOURLIS delivered the Opinion of the Court.

Petitioner Jones Intercable, Inc. (Jones), the Defendant below, is the general partner of three limited partnerships. Jones seeks relief from the district court's ruling refusing to dismiss a derivative action brought by the limited partners of those partnerships, who are the Respondents in this action and the Plaintiffs below, despite the fact that the limited partners did not make a demand upon Jones prior to filing suit. Jones also seeks relief from the district court's decision not to dismiss Respondents' action on the basis of the report of an Independent Counsel whom the court appointed to review and report on Respondents' derivative claims. We issued a rule to show cause under C.A.R. 21, directing Respondents to show cause why the relief requested by Jones should not be granted.

We conclude that because the allegations of this particular complaint sufficiently established that demand upon Jones would have been futile in this case, the district court did not err in refusing to dismiss Respondents' actions for failure to make demand. We further conclude that under the Colorado Uniform Limited Partnership Act of 1981, the rights of the parties as to derivative actions are much like those of shareholders. We evaluate the action accordingly, and follow the New York approach governing court involvement in corporate derivative actions. That is, once a special litigation committee (SLC) is duly appointed by the general partner and acts on behalf of the partnership in seeking to dismiss the action brought in the name of the limited partnership, the trial court's role is limited to determining the authority, independence, and good faith of the SLC. Because no Colorado case had set out this standard previously, the trial court did not make such an inquiry and findings here. Accordingly, we return the case to the trial court for that inquiry and for further proceedings consistent with this opinion.

## I.

Jones is a publicly owned Colorado corporation that owns, operates, and manages cable television systems. It is the general partner of three limited partnerships called Cable TV Fund 12–B, Ltd.; Cable TV Fund 12–C, Ltd.; and Cable TV Fund 12–D, Ltd. (the Funds). Jones formed these partnerships in order to acquire, develop, and operate cable television systems.

In 1986, the three partnerships entered into a joint venture, known as Cable TV Fund 12–BCD Venture (the Venture), "for the purpose of acquiring, owning, managing, and otherwise dealing with community antenna television systems and matters related thereto." The Funds entered into this agreement pursuant to the Colorado Uniform Limited Partnership Act of 1981, sections 7–62–101 to –1201, 2 C.R.S. (1998). The agreement provided that all decisions regarding the management and affairs of the Venture were to be made by Jones in its capacity as general partner of each of the Funds. The agreement further provided that the Venture could enter into a purchase and sale agreement for the acquisition of cable television systems in which the Venture was the seller and Jones was the buyer. The identical limited partnership agreements governing each of the Funds comprising the Venture provided that any of the Funds (as limited partnerships) could sell a system to Jones (as the general partner of the Funds) provided that the price paid to the Fund under such a circumstance would be the average of three separate independent appraisals of the particular partnership property.

In 1986, the Venture acquired a cable television system known as the "Tampa System" for approximately $42,000,000. On August 11, 1995, Jones and the Venture entered into an agreement for Jones to purchase the Tampa System from the Venture for $110,395,667,[1] an amount representing the average of the three independently conducted appraisals that had been completed earlier in the year. On that same day, Jones entered into an asset exchange agreement with the Time–Warner Entertainment Advance/Newhouse Partnership (TWEAN), pursuant to

---

1. The Independent Counsel noted in his report that "[w]ith a working capital adjustment," the total amount that Jones paid to the Venture for the Tampa System was $111,455,690.

which Jones conveyed to TWEAN the Tampa System, two other cable systems, and $3,500,000 in cash in exchange for a number of TWEAN's cable systems.

On August 22, 1997,[2] Respondents initiated a derivative action against Jones, alleging that Jones's actions in engaging in those transactions constituted: (1) a breach of fiduciary duty to the Venture, the Funds, and the limited partners in the Funds; (2) a breach of contract (i.e., a breach of the joint venture agreement and the limited partnership agreements); and (3) a breach of the covenant of good faith and fair dealing implicit in the joint venture agreement and the limited partnership agreements. Specifically, Respondents allege that the three appraisals from which Jones arrived at a purchase price for the Tampa System "grossly understate[d] the true value of the Tampa System." Respondents contend that geographical considerations regarding other cable systems already owned by TWEAN rendered especially valuable the property that Jones offered to exchange to TWEAN. As a result, Respondents claim that in that exchange, Jones received property worth $41,000,000 more than the property it traded to TWEAN. Respondents calculate that because the Tampa System represented approximately sixty-three percent of the consideration Jones traded to TWEAN in the exchange, the value of the Tampa System when Jones purchased it from the Venture should have been increased by sixty-three percent of the $41,-000,000 profit that Jones allegedly received in the TWEAN exchange.

2. On this date, Respondents filed a consolidated amended complaint and jury demand against Jones in a derivative action. Respondents had initially brought the suit as a class action.

3. The agreement defines "independent director" as "a person who is free from any relationship that would interfere with the exercise of independent judgment by such person as a member of the Board." The agreement lists examples of parties who would not be independent directors because of their relationships with entities that owned interests in Jones, namely Bell Canada International, Inc. and Jones International, Ltd. (Bell Canada International, Inc. held a 30% equity interest in Jones. Jones International, Ltd.

## II.

Respondents brought a derivative complaint in the district court, and initially they did not make demand upon Jones. Rather, they made the following allegations regarding futility of demand:

1. Jones Intercable is interested in the transactions in question and has inherent conflicts of interest;

2. [T]he challenged transaction is not the product of arms-length negotiations but rather is a self-dealing transaction in which Jones Intercable stands on both sides; and

3. [T]he transaction has been completed.

Jones responded with a motion for summary judgment, arguing that Respondents did not meet the requirements for pursuing a derivative action under C.R.C.P. 23.1. Specifically, Jones argued that Respondents' allegations of futility of demand were insufficient as a matter of law. Jones contended that the fact that demand in Respondents' case would entail asking Jones to sue itself did not render demand futile because Jones was governed by a board of directors, a majority of whom were disinterested as defined by Jones's shareholders agreement.[3]

The trial court denied Jones's motion for summary judgment, concluding "that genuine issues of material fact exist as to whether or not the plaintiff has established whether there is futility in moving forward." The trial court then ordered that Respondents file a demand on Jones, and that Jones appoint an independent counsel, subject to

held 47% of the common stock and 9% of the Class A stock of Jones. Glenn Jones, the Chairman of the Board of Directors and Chief Executive Officer of Jones, individually owned all of the outstanding shares of Jones International, Ltd.)

The specified examples include: a person who has been employed by or has been a director or officer of a Jones or Bell Canada entity; a person who has held more than 5% of the shares of an entity that has had a material business relationship with a Jones or Bell Canada entity; a person who has held more than 5% of the shares of a Jones or Bell Canada entity; or a member of the immediate family of a person described by the preceding three clauses.

court approval, "to review, consider and report on the demand." [4]

Pursuant to the court's order, Respondents subsequently made demand upon Jones, requesting that Jones authorize the continued prosecution of the action upon a determination that Respondents' claims against Jones were litigable.[5] Jones notified Respondents and the court that its Board of Directors had appointed an attorney, David G. Palmer, to investigate Respondents' claims.[6] Respondents had no objection to Jones's selection of Palmer, and Jones moved for the court to appoint Palmer as Independent Counsel. Upon the stipulation of counsel, the court appointed Palmer.

The Independent Counsel submitted a report to the court, in which he concluded that "Plaintiffs' claims are not meritorious and are not supported by a preponderance of the evidence," and that therefore it would not be "appropriate or desirable" for Jones's Board of Directors to pursue the claims set forth in Plaintiffs' complaint.[7] In light of the Independent Counsel's conclusion, Jones made a motion seeking dismissal or summary judgment. Jones argued that pursuant to the business judgment rule, a trial court must dismiss a derivative action where a special litigation committee or an independent counsel has concluded that the action is without merit.

The trial court rejected this argument. The court refused to accept the Independent Counsel's report "as the final factual determination in this case," and denied Jones's motion for summary judgment, apparently concluding that issues of fact existed as to Respondents' claims.

Pursuant to C.A.R. 21, Jones now seeks review of two of the trial court's rulings. First, Jones contends that the trial court erred in failing to dismiss the complaint initially, because Respondents failed to make a demand on Jones and failed to prove that such a demand would have been futile. Second, Jones argues that the trial court erred in refusing to dismiss the complaint in the second instance in light of the fact that the Independent Counsel concluded that Respondents' derivative claims were without merit.

### III.

In the corporate context,[8] a derivative action is a mechanism by which shareholders

4. The court explained that it took the unusual measure of appointing a special counsel "because it believed that defendant Jones Intercable, Inc. did not, at least in January, 1998, maintain a special litigation committee. The Court also felt that an independent review of the demand was essential because of the nature of plaintiffs' allegations."

If the matter had instead been referred by Jones to a previously established and duly authorized litigation committee, this case would be in a different procedural and substantive posture.

5. Although they made demand pursuant to the court's order, Respondents maintained that they "d[id] not consent to the demand procedures established by the Court or otherwise waive their right to maintain that demand upon Jones would not have been likely to succeed."

6. In appointing Palmer, the Board of Directors was acting for Jones in its role as general partner, on behalf of the limited partnerships.

7. Specifically, the Independent Counsel stated:

My analysis, based on the record before me, is that Jones did not breach a fiduciary duty owed to Plaintiffs, or to the partnerships and Venture, and that Jones did not commit any impropriety in connection with the subject transaction. I conclude that the appraisals of the Tampa System were independent and objective, and met the requirements as set forth by the applicable Prospectus and Limited Partnership Agreements. Jones met its fiduciary duties of fairness and full disclosure to the partnerships and the Venture. From the evidence and testimony in the record, the challenged appraisals were objectively done, and no significant or material information was withheld from the appraisers. The evidence is not persuasive that the Tampa System was somehow worth significant additional millions of dollars because of perceived "clustering" or geographic benefits, or that the various internal accounting runs done by Jones and/or Time Warner were anything other than internal modeling documents as testified by both Mr. Hampton and his counterpart at Time Warner, Mr. Elberson. The transaction was fair to the partnerships and the Venture, and was fairly handled by Jones and its management.

8. We note at the outset that in this case, Respondents bring their derivative action in the limited partnership context. Accordingly, their right to assert their claims against Jones derives from section 7-62-1001, 2 C.R.S. (1998), of the Colorado Uniform Limited Partnership Act of 1981.

can sue on behalf of a corporation when those in control of the corporation have opted not to pursue a claim belonging to it. *See, e.g.,* C.R.C.P. 23.1; Paul H. Dawes & Mary E. Kostel, *The Treatment of the Demand Requirement and the Use of the Special Litigation Committee in Delaware Law and in the American Law Institute's "Principles of Corporate Governance: Analysis and Recommendations,"* Practising Law Institute (1992); *see also Kamen v. Kemper Financial Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Because the law recognizes the authority of a corporation's directors to manage the business and affairs of a corporation,[9] however, courts exercise restraint in allowing a plaintiff to initiate and proceed with a claim in the name of the corporation. *See Bell v. Arnold,* 175 Colo. 277, 282, 487 P.2d 545, 547 (1971). Courts will only hear the complaint of an individual stockholder when "all efforts to obtain redress from the directors have been exhausted or would have been futile." *Id.*

■ In essence, "the derivative suit may be viewed as the consolidation in equity of, on the one hand, a suit by the shareholder against the directors in their official capacity, seeking an affirmative order that they sue the alleged wrongdoers, and, on the other, a suit by the corporation against these wrongdoers." Note, *Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit,* 73 Harv. L.Rev. 746, 748 (1960).

Accordingly, a shareholder intending to sue in the name of a corporation must first make demand upon the directors and/or the shareholders of a corporation, or must specify the reasons why making such demand would have been futile. *See, e.g., Bell,* 175 Colo. at 282, 487 P.2d at 547.

In Colorado, C.R.C.P. 23.1 delineates the procedures for fulfilling these demand requirements in the context of a shareholder's derivative action pursued in the name of a corporation. It mandates, in pertinent part, that shareholders "shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort." C.R.C.P. 23.1.

■ Derivative actions and their demand requirements exist to enforce fiduciary duties in the context of limited partnerships[10] as well as in the corporate context. *See, e.g., Caley Invs. I v. Lowe Family Assocs., Ltd.,* 754 P.2d 793, 796 (Colo.App.1988); *see also* Edwin W. Hecker, Jr., *Limited Partners' Derivative Suits Under the Revised Uniform Limited Partnership Act,* 33 Vand. L.Rev. 343, 355 (1980); Note, *Procedures and Remedies in Limited Partners' Suits for Breach of the General Partners' Fiduciary Duty,* 90 Harv. L.Rev. 763, 764–65 (1977). The Colorado Uniform Limited Partnership Act es-

---

Because the demand requirements of a derivative action in the limited partnership context are similar to those in the corporate context, we look to the demand procedures as set out in rules and case law in the corporate context for guidance. *See Seaford Funding Ltd. Partnership v. M & M Assocs. II, L.P.,* 672 A.2d 66, 70 (Del.Ch.1995) ("Demand refused issues appear similar in the limited partnership and corporate contexts.")

**9.** *See, e.g.,* § 7–108–101(2), 2 C.R.S. (1998) ("Subject to any provision set forth in the articles of incorporation, all corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, the board of directors or such other persons as the articles of incorporation provide shall have the authority and perform the duties of a board of directors."); *People ex rel. Arkansas Valley Sugar Beet & Irrigated Land Co. v. Burke,* 72 Colo. 486, 495, 212 P. 837, 841 (1923) ("Our lawmaking body clearly mani-

fested its intention to vest in the board of directors of a corporation all corporate powers....").

**10.** We have previously defined a limited partnership as:

a partnership formed by two or more persons, having as its members one or more general partners who manage the business and are personally liable for partnership debts, and one or more limited partners who contribute capital and share profits but take no part in running the business and incur no liability beyond their capital contributions.

*Winter Park Devil's Thumb Invest. Co. v. BMS Partnership,* 926 P.2d 1253, 1255 (Colo.1996) (footnote omitted). We address this case in the limited partnership context because it arises as a result of Jones's actions as the general partner of each of the three limited partnerships known collectively as the Funds.

tablishes a requirement similar to that of C.R.C.P. 23.1 for a derivative action by a limited partner on behalf of the partnership against a general partner. *See* § 7–62–1001, 2 C.R.S. (1998). Section 7–62–1001 provides in part that in order to bring a derivative action, a limited partner must establish "[t]hat those general partners with authority to do so have refused to bring the action or that an effort to cause those general partners to bring the action is not likely to succeed." *Id.*

## IV.

Here, Respondents bring their derivative action as limited partners suing in the name of the limited partnerships. We turn, then, to the issue of determining whether Respondents in this case met the demand requirements of section 7–62–1001. The parties do not dispute that Respondents did not initially make demand upon Jones. Rather, the issue is whether Respondents' allegations of demand futility were sufficient to excuse them from making demand upon Jones.

We touched upon the sufficiency required to demonstrate demand futility under C.R.C.P. 23.1 in *Neusteter v. District Court,* 675 P.2d 1, 7 (Colo.1984). In that case, the minority shareholders of the Neusteter Realty Company brought a derivative action[11] alleging breach of fiduciary duty against the corporation and five members of the Neusteter family, who were the majority shareholders and the directors of the corporation. The plaintiffs alleged that the Neusteters engaged in various improper activities in an attempt to use the assets of the Realty Company to alleviate financial difficulties experienced by another company owned by the Neusteters.

In response to the defendants' argument that plaintiffs failed to comply with the demand requirements of C.R.C.P. 23.1, we noted that "both the directors and the majority shareholders who have the ability to cause the realty company to seek relief are the very persons alleged to have committed the wrongs sought to be remedied." *Neusteter,* 675 P.2d at 7. Accordingly, we concluded:

> The futility of seeking the desired action from the alleged wrongdoers is patent; under such circumstances, efforts to obtain action by the directors and shareholders are not necessary, and the allegations of wrongdoing themselves adequately establish the reasons for not making the effort to obtain corporate action.

*Id.; see New Crawford Valley, Ltd. v. Benedict,* 847 P.2d 642, 645 (Colo.App.1993) ("C.R.C.P. 23.1 did not require plaintiffs to perform the futile act of demanding that they sue themselves"); *Greenfield v. Hamilton Oil Corp.,* 760 P.2d 664, 666 (Colo.App.1988) (noting that if the officers or directors that have the authority to take the action demanded are the ones against whom the desired action would be taken, the allegations themselves adequately establish reasons for not making demand); *see also, e.g., Barr v. Wackman,* 36 N.Y.2d 371, 368 N.Y.S.2d 497, 329 N.E.2d 180, 185 (1975)(concluding that demand is not necessary if "the complaint alleges acts for which a majority of the directors may be liable and the plaintiff reasonably concluded that the board would not be responsive to demand").

■ Respondents argue that as in *Neusteter,* the reasons for the futility of demand here are self-evident because Jones, the general partner on whom Respondents would have served demand, was the same interested entity that committed the alleged wrong. We agree.

The wrong that Respondents allege is Jones's acquisition of the Tampa System from the Venture at an unfair price, resulting in a windfall to Jones at the expense of the Funds. Such an allegation necessarily implicates a breach of the duty of fair dealing by the Jones Board of Directors as an

11. The plaintiffs' complaint in that case alleged acts, which if proven, normally would justify damages accruing to the company in a derivative suit. However, because the plaintiffs also alleged fraudulent acts that involved waste of corporate assets, the plaintiffs actually sought dissolution of the company, and asked to receive through the liquidation process their share of the damages that would have accrued to the company. *See Neusteter,* 675 P.2d at 3–4. The unusual nature of the relief sought by the plaintiffs in that case does not preclude the application of our discussion of demand futility to the resolution of the current dispute.

entity. *See Hooper v. Yoder*, 737 P.2d 852, 859 (Colo.1987) (describing fiduciary duties in the partnership context). That is, as the Board of Directors of Jones in Jones's role as the general partner of the Funds, the Directors had a duty to act in the best interests of the Funds, which would mean seeking the highest possible selling price for the Tampa System; but in the role of the Board of Directors of Jones in its own right, the Directors had a duty to act in the best interests of Jones, which would mean seeking the lowest possible purchase price for the Tampa System. Respondents allege that the Directors acted in the best interests of Jones to the detriment of the Funds. Thus, all of the directors allegedly were directly involved in approving the challenged action in which they all were inherently interested. As in *Neusteter*, the futility of demanding that they sue themselves is patent.[12]

We note, however, that in many cases, an unparticularized allegation that the actors from whom demand is sought are the same actors responsible for the alleged wrong might not satisfy the requirements of section 7-62-1001. Here, the allegation of wrongdoing arises in the context of limited partnerships that each had the same single general partner, and all of the directors who approved the transaction at issue were interested. This situation is neither one in which a group of general partners has approved a transaction alleged to disproportionately benefit one interested general partner, nor one in which a board of directors approved a transaction that unfairly benefited one or two directors. In either of those scenarios, broad allegations of self-interest and self-dealing might not have been specific enough to rebut the presumption that the remaining general partners or directors were disinterested and independent and that the challenged transaction was the product of a valid exercise of business judgment. *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del.1984) ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is in-

sufficient to challenge either the independence or disinterestedness of directors.").

Accordingly, we conclude that the trial court did not err in refusing to dismiss Respondents' complaint or award summary judgment for Jones in response to Jones's allegations that Respondents' complaint did not satisfy demand requirements.

## V.

Having concluded that the trial court properly allowed the Respondents to initiate a suit against Jones, we must next address whether the court was correct to allow the suit to continue despite the Independent Counsel's conclusion that Respondents' claims were not meritorious.

■ As we have noted, demand upon Jones prior to initiation of the suit was unnecessary in this case because Jones, as the general partner of each of the Funds, was the very entity charged with wrongdoing. Therefore, in this case, demand against Jones would have been futile. However, because the derivative action belongs to the partnerships despite the fact that it is brought by the limited partners, the board of directors of the general partner must eventually address the question of the propriety of going forward with the suit, even in cases where demand was futile and the board did not have the opportunity to address the question of whether the suit should be initiated in the first place. *Cf. Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del.1981) (holding, in the context of a derivative suit against a corporation, that the corporation's board of directors retains the authority to make decisions regarding litigation on behalf of the corporation even where demand was futile); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1000–01 (1979) (concluding that derivative claims against the governing body of a corporation, i.e., its board of directors, belong to the corporation itself, and that the decision regarding the extent to which to pursue those

---

12. Both parties and the trial court raised to some extent the issue of whether the Jones directors were "independent" as defined in Jones's shareholder agreement. Since we conclude that demand was futile because all of the directors were interested in the transaction as a result of their divided loyalties to Jones and to the Funds, we do not reach the issue of the personal independence of each of the directors in terms of individual financial or familial interests.

claims lies within the control of the board of directors).

■ The decision regarding whether to dismiss the suit is ordinarily delegated to a special litigation committee (SLC) formed of individuals independent of those charged with the wrongdoing.[13] The SLC conducts a thorough investigation and, depending upon its findings, may make a decision to move to dismiss the litigation. *See* Dawes & Kostel, *supra*, at 401–402. That decision is subject to review by a court, and the extent of that review varies by jurisdiction.

■ Two major approaches have emerged regarding the trial court's role in reviewing the decision of an SLC. New York law limits the court's discretion to one discrete inquiry: whether the members of the SLC are disinterested and independent. *See Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1001. If they are, then the court must defer to the SLC's judgment. *See id.* This approach is premised on the business judgment doctrine, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Id.* at 1000. Accordingly, although a court should inquire into the independence of the SLC and the methods and procedures it has used to conduct its investigation, it should not intrude into the SLC's substantive determination regarding the litigation, because to do so "would work an ouster of the board's fundamental responsibility and authority for corporate management." *Id.* at 1002.

Delaware law, on the other hand, affords a reviewing court a much more substantive role. As in New York, the court first inquires into the good faith and independence of the SLC and the reasonableness of its investigation. *See Zapata*, 430 A.2d at 788. However, even if the court is satisfied that the SLC is disinterested and independent, the Delaware approach requires the court to then apply its own business judgment to determine whether the claim should be dismissed.[14] The Supreme Court of Delaware noted that such an approach was appropriate because the Chancery Court of Delaware "regularly and competently deals with fiduciary relationships, disposition of trust property, approval of settlements and scores of similar problems." *Id.* at 788. Moreover, the court reasoned that application of such a standard provides "the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee." *Id.* at 789.

We have not previously addressed which approach should apply in our state. We now adopt the New York rule as the standard for

---

**13.** *See Greenfield*, 760 P.2d at 667; *see also Zapata*, 430 A.2d at 785; *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1001; Gregory V. Varallo, et al., *From* Kahn *to* Carlton: *Recent Developments in Special Committee Practice*, 53 Bus. Law. 397, 397 (1998) (noting that an SLC is "typically formed to consider a stockholder demand that the corporation take action against one or more directors, or to investigate the desirability of continuing to litigate a properly commenced and ongoing derivative suit").

Iowa has held that directors who are not in a position to make a decision regarding the propriety of a suit are also unable to delegate that responsibility to others chosen by them. *See Miller v. Register & Tribune Syndicate, Inc.*, 336 N.W.2d 709, 718 (Iowa 1983). To date, Iowa is the only state to have adopted such a position, and we choose not to accept that approach.

**14.** *See id.* at 789. We note that under Delaware law, the standard for reviewing an SLC's decision varies depending on whether the decision arises in the context of determining whether to sue (in cases where demand is made) or in the context of deciding whether to pursue litigation already ongoing (in cases where demand was futile). *See Zapata*, 430 A.2d at 784 n. 10 (noting that in cases where plaintiffs make demand, the SLC's decision is subject only to the business judgment rule). Moreover, other jurisdictions have opted to require the court to apply its own business judgment to an SLC's decision regardless of whether the decision arises in the context of a case in which demand was futile or a case in which demand was made. *See Alford v. Shaw*, 320 N.C. 465, 358 S.E.2d 323, 326 (1987); *see also Houle v. Low*, 407 Mass. 810, 556 N.E.2d 51, 59 (1990) (requiring courts to determine in either situation whether the SLC's decision was reasonable and principled). Because we adopt the New York approach, under which a court applies the same standard of review to the SLC's decision regardless of whether it arises in the context of a demand-refused or a demand-futile case, we do not regard the distinction as relevant to our decision here.

reviewing an SLC's decision in Colorado. We agree with the Court of Appeals of New York that because most courts "are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments," *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1000, the role of a Colorado trial court in reviewing an SLC's decision regarding derivative litigation should be limited to inquiring into the independence and good faith of the committee.

■ Here, the trial court did not make any findings with regard to whether the Independent Counsel was in fact independent and disinterested or whether the procedure he undertook for evaluating the claims was appropriate. Moreover, the court did not address the parties' dispute with regard to the threshold question of whether the Independent Counsel was properly authorized with the full and final authority of Jones's Board of Directors as the governing entity of the General Partner of the Funds. Such authority must be delegated before an SLC is capable of making a business decision entitled to the deference of a reviewing court. As our court of appeals noted in *Greenfield*,

> [T]he purpose to be served by any special litigation committee is to *substitute* its independent, and presumably objective, judgment for the judgment of the directors who have been accused of wrongdoing. Such a purpose cannot be fulfilled where ... the committee is given only the power of recommendation, while the power of ultimate decision is still retained in the hands of the accused wrongdoers.

760 P.2d at 668; *see also Gall v. Exxon Corp.*, 418 F.Supp. 508, 517 (S.D.N.Y.1976) ("The focus of the business judgment rule inquiry is on those who actually wield the decision-making authority, not on those who might have possessed such authority at different times and under different circumstances."); *Millsap v. American Family Corp.*, 208 Ga.App. 230, 430 S.E.2d 385, 387 (1993); Dawes & Kostel, *supra*, at 400.

Here, the trial court decided not to defer to the Independent Counsel's business judgment. That conclusion may or may not be correct, depending upon the answer to the questions of whether the Independent Counsel was properly authorized to proceed as an SLC, and if so, whether he was an independent and disinterested decision-maker.

■ Hence, on remand, the trial court must make those preliminary determinations. If the Independent Counsel was acting with Jones's authority, was independent, and did employ reasonable procedures in his analysis, then the court may not second-guess his business judgment in deciding not to pursue the derivative litigation. If, on the other hand, one of those elements is missing, then the court need not defer to his judgment.

## VI.

We thus conclude that the trial court did not err in its initial decision refusing to dismiss Respondents' complaint because of their failure to make demand. We hold that the court did err, however, in disregarding the Independent Counsel's decision that the litigation should not proceed without first addressing whether the Independent Counsel lacked the authority or ability to make a disinterested and independent decision on behalf of Jones.

We discharge our rule to show cause in part, make it absolute in part, and direct the trial court to determine whether the Independent Counsel had the authority, independence, and good faith to entitle his decision to deference.

Justice HOBBS and Justice BENDER do not participate.